196 F.3d 56 (2nd Cir. 1999)
 X-MEN SECURITY, INC.; ANTHONY RICHARDS, President, X-Men Security, Inc.; and SHEILA BOYD, President of Ocean Towers Tenant Association, on behalf of the Ocean Towers' Tenants, Plaintiffs-Appellees,
v.
GOVERNOR GEORGE PATAKI, individually; JOSEPH H. HOLLAND, Commissioner of the Division of Housing and Community Renewal, individually; DU THIRD REALTY, INC.; BSR MANAGEMENT CORPORATION; BERNARD JERESKI, individually, and as a Managing Partner of DU THIRD REALTY, INC.; and AARON SILBERMAN, individually and as an Officer of BSR Management Corporation, Defendants,
JULES POLONETSKY, individually; PETER KING, individually, Defendants-Appellants.
 Docket Nos. 97-9023(L), 97-9595(CON)
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: January 15, 1999
Decided: November 02, 1999
 
 Appeal from orders of the United States District Court for the Eastern District of New York, I. Leo Glasser, Judge, denying legislators' motions for dismissal on the ground of qualified immunity with respect to their statements about certain of the plaintiffs. See 983 F. Supp. 101 (1997).
 Reversed.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 MICHAEL A. HARDY, New York, New York (Terence C. Scheurer, Scheurer, Wiggin & Hardy, New York, New York, on the brief), for Plaintiffs-Appellees.
 THOMAS D. HUGHES, Deputy Solicitor General, New York, New York (Dennis C. Vacco, Attorney General of the State of New York, John W. McConnell, Deputy Solicitor General, Katharine Demgen, Assistant Attorney General, New York, New York, on the brief), for Defendant-Appellant Jules Polonetsky.
 STEPHEN J. RIEGEL, Assistant United States Attorney, Brooklyn, New York (Zachary W. Carter, United States Attorney for the Eastern District of New York, Varuni Nelson, Assistant United States Attorney, Brooklyn, New York, Geraldine R. Gennet, General Counsel, Michael L. Stern, Senior Counsel, United States House of Representa- tives, Washington, D.C., on the brief), for Defendant-Appellant Peter King.
 Before: WINTER, Chief Judge, KEARSE, Circuit Judge, and HAIGHT, District Judge.*
 KEARSE, Circuit Judge:
 
 
 1
 Defendants Jules Polonetsky, a former member of the New York State Assembly, and Peter King, a member of the United States House of Representatives (collectively the "legislators"), appeal from orders of the United States District Court for the Eastern District of New York, I. Leo Glasser, Judge, denying their motions pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss, on qualified-immunity grounds, the claims of plaintiffs XMen Security, Inc., and its principal owner Anthony Richards (collectively "XMen") under 42 U.S.C. 1983 and 1985 (1994), alleging invidiously motivated interference with XMen's business. The district court denied those motions, ruling that the complaint sufficiently states a claim on which relief can be granted against Polonetsky and King for violation of XMen's rights under the First Amendment and the Equal Protection Clause of the Constitution, and that a decision with respect to qualified immunity would be premature prior to any discovery. On appeal, Polonetsky and King contend that the court should have granted their motions because their entitlement to qualified immunity is revealed on the face of the complaint. For the reasons that follow, we agree.
 
 I. BACKGROUND
 
 2
 The present controversy arises out of the furnishing of security services for Ocean Towers, a housing complex in Brooklyn, New York. At the pertinent times, Ocean Towers was owned by defendant DU Third Realty, Inc. ("DU"), of which defendant Bernard Jereski was a partner, and was managed by defendant BSR Management Corp. ("BSR" or "B/S/R Management"), of which defendant Aaron Silberman was an officer (these four defendants collectively referred to as the "private defendants"). Though privately owned, Ocean Towers receives a significant level of public financing from New York State ("State") and the United States government and is thus subject to regulation and oversight by State and federal authorities, including the State Division of Housing and Community Renewal ("DHCR") and the United States Department of Housing and Urban Development ("HUD"). Some of the contracts for services to Ocean Towers are required to be submitted to DHCR for approval, see 9 N.Y.C.R.R. 17284.1(d).
 
 
 3
 XMen is a provider of security services. A majority of its employees are of "Black African American descent" and are "followers of the Islamic Religion," attending mosques that follow the teachings of the Nation of Islam, one of whose recognized ministers is Louis Farrakhan. (Complaint 32.) From June 1993 until October 1996, XMen provided security services at Ocean Towers. As set forth in greater detail below, plaintiffs contend that XMen's contract to provide those services was not renewed by the private defendants because of statements by Polonetsky and King that were motivated by racial and religious prejudice.
 
 
 4
 The complaint, whose factual allegations must be accepted as true for purposes of deciding or reviewing a Rule 12(b)(6) motion to dismiss, see, e.g., McEvoy v. Spencer, 124 F.3d 92, 95 (2d Cir. 1997), alleges the following events.
 
 
 5
 A. The Allegations as to XMen's Services at Ocean Towers
 
 
 6
 By the early 1990s Ocean Towers had become a dangerous place to live, victimized by "the scourge of drugs and the wrath of ... drug gangs" and characterized by high levels of violent crime. (Complaint 20.) The various companies theretofore retained to provide security at the complex either resigned, or "were terminated by management for their failure to resolve the crime and drug trafficking problems," or themselves became aligned with criminal elements at Ocean Towers. (Id. 22(c).) In June 1993 (see Complaint Exhibit B), BSR entered into a contract, subsequently approved by DHCR, with N.O.I. Security Agency Inc. for security services at Ocean Towers (the "1993 contract" or "Ocean Towers contract") on a "month to month basis" (Complaint Exhibit A). N.O.I. assigned the 1993 contract to XMen.
 
 
 7
 When XMen began performing under the 1993 contract, safety at Ocean Towers immediately began to improve. Vandalism was significantly reduced, and drug trafficking was eliminated. Simultaneously, however, according to the complaint, Polonetsky, whose New York Assembly district encompassed Ocean Towers, and King, whose Congressional district was nearby, began to organize a conspiracy to oust XMen (see Complaint 3839) "because plaintiffs XMen and Richards are composed of or are African-American and Muslim" (id. 36). The complaint alleges that in fact XMen is not "connected or affiliated or owned in whole or part by the religious corporation of the Nation of Islam" (id. 34); however, when public bidding was opened for the next security contract for Ocean Towers, in compliance with DHCR regulations (the "1994 bidding"), Polonetsky and King contrived to impede the retention of XMen by representing that there was such a connection:
 
 
 8
 39. The goal of the conspiracy was to cause the termination of service contracts that plaintiffs held with defendants DU Realty and B/S/R Management and to preventplaintiffs XMen and Richards from procuring future contracts
 
 
 9
 40. The manner in which the conspiracy was carried out was to hide behind their official positions to create a public frenzy which would lead to the termination of the contract upon illegal discriminatory grounds and to coerce and entice others to join the conspiracy.
 
 
 10
 41. The actions of the defendants were intentional, negligent and motivated by racial and religious prejudice.
 
 
 11
 42. The focus of defendants' statements were [sic] the allegations made by defendant Polonetsky and other co-conspirators that the XMen were completely controlled by Minister Louis Farrakhan and that monies from the contract went directly to the Nation of Islam.
 
 
 12
 43. Defendants at various times caused false accusations to be made against plaintiff XMen that they attempted to distribute their religious literature and recruit tenants into their religious organization while on duty.
 
 
 13
 44. Defendants at various times caused additional false accusations to be made against plaintiff XMen that they were a "hate group" and "racist." Further, defendant Polonetsky as a means of convincing co-defendants and other conspirators to join the conspiracy caused accusations to be made that the XMen, its employees and Richards as its principal owner were guilty of fraud, mismanagement, unpaid debts, and other irregularities.
 
 
 14
 45. On or about September 24, 1994, defendant Polonetsky along with King planned and forwarded under [sic] defendant Polonetsky's signature a letter to then DHCR Commissioner Donald Halperin which accused plaintiffs XMen and Richards of hating Jews, women, Catholics and others. Specifically, Polonetsky stated "Since the Nation of Islam promotes hatred against whites, Jews, women, Catholics and others, it is difficult to understand how the XMen are eligible for a state supported contract - which requires compliance with equal employment and non-discrimination guidelines. It seems clear that state support for this contract subsidizes the activities of a hate group and helps fund the racist and anti-Semitic goals of Louis Farrakhan and the Nation of Islam."
 
 
 15
 46. In that same letter Polonetsky urged then Commissioner Halparin [sic] to terminate the contract with the XMen. These actions were not based upon any reasonable belief, but motivated purely to further the aim and goals of the conspiracy and cause the plaintiffs los[s] of property on the basis of defendants' individual racial and religious prejudice.
 
 
 16
 (Complaint 3946.)
 
 
 17
 The complaint alleges that the private defendants at first participated in the conspiracy, notifying XMen in November 1994 that the 1993 contract "would not be renewed for any definite period" (id. 47), and "effectively exclud[ing]" XMen from consideration (id. 48). XMen did not submit a bid in the 1994 bidding. However, the private defendants "attempted to then resist further participation in this illegal scheme to deny the XMen their rights" (id. 50): DU and BSR rejected all of the bids submitted during the 1994 bidding process (see id. 49, 50) and recommended to DHCR that all of the 1994 bids be rejected and that XMen be retained (see Complaint Exhibit A). DU and BSR "were forced to do so after the tenants of Ocean Towers made [a] show of support for the XMen." (Complaint 49.)
 
 
 18
 "Notwithstanding this setback to their conspiracy" (id. 51), the legislators asked HUD and a United States Congressional Committee to investigate XMen for possible improprieties. The complaint alleges "[u]pon information and belief" that thereafter, in or about March 1995, HUD concluded that XMen had no official affiliation with either Farrakhan or the Nation of Islam and that the FBI did not consider the Nation of Islam to be a hate group. (Id. 52, 53.) The legislators "ridiculed" these findings (id. 56) and "intensified their efforts to illegally harass, conspire and discriminate against the XMen" (id. 55), continuing to "pressure" DHCR and the private defendants to remove XMen from Ocean Towers (id. 56).
 
 
 19
 A new bidding process was conducted (the "1995 bidding"); but there was no responsible low bidder (see id. 64). The contract to provide security services to Ocean Towers was initially awarded to a company that had submitted a "bogus bid" and was not capable of performing those services; the contract was subsequently awarded to a company that had not submitted a bid during the 1995 bidding. (Id.) Pursuant to a letter dated September 9, 1996, XMen's month-to-month contract was terminated as of October 10, 1996.
 
 B. The Proceedings in the District Court
 
 20
 Following the termination of XMen's contract, the present action was commenced principally under 42 U.S.C. 1981, 1983, and 1985, and state law by XMen and Richards, along with Ocean Towers tenant Sheila Boyd, against (a) State Governor George Pataki and DHCR Commissioner Joseph H. Holland as "regulators of the Ocean Towers" (Complaint 67), (b) the private defendants, and (c) the legislators, asserting violations of plaintiffs' rights to, inter alia, due process, equal protection, freedom of religion, and freedom of association. The complaint alleges that the above
 
 
 21
 actions by defendants were and continue to be motivated by the race and religion of the XMen's officers and employees. By terminating the XMen's contract the defendants' actions have in essence "black balled" plaintiff XMen and Richards from participating in contracts which receives [sic] government subsidies on the basis of their race and religion.
 
 
 22
 (Id. 69.) The complaint seeks a total of $200 million in "compensatory damages, damages for los[t] future earnings and punitive damages." (Id. WHEREFORE a.) No injunctive relief is requested.
 
 
 23
 Defendants moved to dismiss the complaint on various grounds, including failure to state a claim on which relief can be granted, failure to allege personal involvement by the State executives, and immunity. In a Memorandum and Order dated July 10, 1997, reported at 983 F. Supp. 101, 101-118, the district court ruled that Boyd lacked standing to assert any of the claims alleged, see id. at 107, and it granted motions to dismiss all of the claims asserted against the defendants other than Polonetsky and King for failure to state a claim on which relief can be granted, see 983 F. Supp. at 108-16.
 
 
 24
 As to Pataki and Holland, the district court dismissed the claims on the ground, inter alia, that the allegations of the complaint were "insufficient to raise an inference that either was involved in the deprivations of XMen's constitutional rights in any [cognizable] way[]." Id. at 111. In dismissing the claims asserted against the private defendants, the court stated that the complaint's allegations
 
 
 25
 do not give rise to an inference that the Private Defendants were motivated by racial animus either to terminate XMen's monthtomonth contract or in failing to award them the new contract after competitive bidding. No allegations are made that evidence a pattern of discriminatory conduct by the Private Defendants and no statements reflecting an intent to discriminate are attributed to Jereski or Silberman. Carefully read, the complaint actually rebuts the suggestion that the Private Defendants possessed discriminatory intent.
 
 
 26
 Id. at 108-09. The court noted that the complaint's allegations as to the private defendants' efforts to retain XMen at Ocean Towers "belie the assertion that the Private Defendants wilfully collaborated with any state actors," id. at 110-11, and "fly in the face of plaintiffs' claim that the Private Defendants discriminated against XMen on the basis of race," id. at 109. The court concluded that "there is no indication of how these defendants were personally involved in the alleged constitutional violations," id. at 111, and that the complaint itself showed that the private defendants "neither entered into the alleged conspiracy nor acted with discriminatory motivation," id. at 115.
 
 
 27
 Polonetsky and King had moved to dismiss largely on the ground of immunity, contending principally that the complaint failed to allege the violation of any clearly established constitutional right and that, in any event, they were entitled to qualified immunity because it was objectively reasonable for them to believe that their advocacy as legislators was constitutionally permissible. In addition, King asserted that he was entitled to absolute immunity under the Speech or Debate Clause of the Constitution. The district court granted these motions in part and denied them in part. The court dismissed the complaint against the legislators to the extent that it purported to assert 1983 claims for deprivation of due process, 1981 claims for racial and religious discrimination, and state-law claims for tortious interference with contract. The court noted, inter alia, that the complaint failed to allege deprivation of a constitutionally protected property interest, see 983 F. Supp. at 113-14; that the allegations that the legislators were motivated by racial animus were conclusory, see id. at 109; and that 1981 does not reach discrimination on the basis of religion, see 983 F. Supp. at 109. The court also dismissed the complaint against King to the extent that it asserted claims based on King's requests that HUD and a Congressional subcommittee investigate XMen, ruling that--that conduct was protected by the Speech or Debate Clause. See id. at 117-18.
 
 
 28
 However, with respect to the charges that the legislators had made false and derogatory statements about XMen, the court ruled that the complaint, though "devoid of any specific allegations that the defendants interfered with the exercise of plaintiffs' religion or freedom of speech," was sufficient under the "First Amendment ... to assert that XMen were terminated in retaliation for their association with the Nation of Islam and Farrakhan." Id. at 111. The court stated as follows:
 
 
 29
 The right of association encompasses the right to associate for the purpose of engaging in those activities protected by the First Amendment, including the exercise of religion. Roberts v. United States Jaycees, 468 U.S. 609, 61718 ... (1984). In this regard, the complaint alleges that Polonetsky and King conspired to bring about termination of the contract based on XMen's affiliation, which is religious in nature, with the Nation of Islam and Farrakhan. Compl. 45. It further states that Polonetsky circulated false statements connecting XMen to Farrakhan and the Nation of Islam in furtherance of his unlawful purpose, and that he and King acted to exclude XMen from the competitive bidding process. These acts allegedly exerted pressure on the Private Defendants and led to termination of the contract and thus are sufficient to raise an inference that XMen were retaliated against based on their association with the Nation of Islam and Farrakhan.
 
 
 30
 983 F. Supp. at 111-12.
 
 
 31
 The court also ruled that the complaint stated a claim against the legislators for violation of XMen's equal protection rights by alleging that XMen was
 
 
 32
 selectively treated. According to the complaint, Polonetsky and King used their public positions to single out XMen to be targets of a campaign of prejudicial statements and false accusations and pressed the Private Defendants to bring XMen's presence at Ocean Towers to a close. Compl. 4245, 56. It is also alleged that they unfairly excluded XMen from the 1994 bidding process. Id. at 48. While plaintiffs fail to specifically allege that other security services were not subject to similar actions, these allegations "necessarily imply that other similarly situated enterprises were not subject to the same harassment." Pisello v. Town of Brookhaven, 933 F.Supp. 202, 211 (E.D.N.Y.1996) (emphasis in original).
 
 
 33
 983 F. Supp. at 112.
 
 
 34
 The district court rejected the legislators' remaining grounds for asserting qualified immunity, indicating that the motions were premature in advance of discovery:
 
 
 35
 Polonetsky and King have moved to dismiss the complaint for failure to state a claim and it appears that little discovery has taken place in this case. Their assertion of the qualified immunity defense is therefore premature. The better time for determining the issue is on a motion for summary judgment.... Accordingly, their motion to dismiss on this ground should be denied.
 
 
 36
 Id. at 117. These rulings left pending only XMen's 1983 and 1985 claims against the legislators for retaliation on account of XMen's association with the Nation of Islam and Farrakhan, in violation of the First Amendment and the Equal Protection Clause.
 
 
 37
 King moved for reconsideration, arguing, inter alia, that the court had erroneously "adopt[ed] a wholly novel and expansive theory of liability for constitutional torts, potentially having a chilling effect on the ability of legislators (and others) to speak out on matters of public importance." (King Memorandum of Law in Support of Motion for Reconsideration at1.) King also argued that the court had inappropriately failed to address, "before discovery, as the Supreme Court has directed," his contention that it was objectively reasonable for him to believe the Constitution permitted him, as a legislator, to speak out on such matters, and that the objective reasonableness of that belief entitled him to an immediate dismissal on the ground of qualified immunity. (Id.) In a Memorandum and Order dated October 29, 1997, reported at 983 F. Supp. 101, 118-21, the district court denied reconsideration, stating that it could not "hold, at this stage of the proceedings, that as a matter of law it was objectively reasonable for King to believe that his conduct was lawful." 983 F. Supp. at 120. Further, the court stated that "even were it determined that defendant King's actions were objectively reasonable, such a finding would not resolve the question of qualified immunity" because the complaint alleges that King had acted with an "unconstitutional motivation." Id. Relying principally on Sheppard v. Beerman, 94 F.3d 823 (2d Cir. 1996), the court stated that the "qualified immunity defense cannot be established on the pleadings alone where an unconstitutional motive is alleged." 983 F. Supp. at 121 (internal quotation marks omitted).
 
 
 38
 Polonetsky and King have appealed from so much of the district court's rulings as denied their motions to dismiss on the ground of qualified immunity.
 
 II. DISCUSSION
 
 39
 On this appeal, which is limited to the legislators' assertions of qualified immunity, no final judgment having been entered in the district court, Polonetsky and King contend that the district court erred (a) in ruling that the complaint states a claim on which relief can be granted against them for violation of plaintiffs' First Amendment and equal protection rights, and (b) in ruling that any such rights were clearly established at the time of their conduct. For the reasons stated in parts II.B. and C. below, we conclude that the complaint does not state a constitutional claim against King or Polonetsky and that their motions to dismiss on qualified-immunity grounds should have been granted. We begin, however, with a discussion of our jurisdiction to hear the present appeal.
 
 
 40
 A. Qualified Immunity and Appellate Jurisdiction
 
 
 41
 Ordinarily, a denial of a motion to dismiss is not immediately appealable because such a decision is not a final judgment. See 28 U.S.C. 1291 (1994). Under the collateral order doctrine, however, even a nonfinal order may be appealed immediately if it (1) "conclusively determine[s] the disputed question," (2) "resolve[s] an important issue completely separate from the merits of the action," and (3) would "be effectively unreviewable on appeal from a final judgment." Richardson-Merrell Inc. v. Koller, 472 U.S. 424, 43031 (1985) (internal quotation marks omitted); Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978). This doctrine permits the immediate appeal of many orders denying motions to dismiss on the ground of qualified immunity.
 
 
 42
 The qualified-immunity doctrine shields "government officials performing discretionary functions ... from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The immunity protects the official not just from liability but also from suit on such claims, thereby sparing him the necessity of defending by submitting to discovery on the merits or undergoing a trial. See, e.g., Siegert v. Gilley, 500 U.S. 226, 232 (1991); Harlow v. Fitzgerald, 457 U.S. at 818. The denial of a motion to dismiss on the basis of qualified immunity satisfies the second and third prerequisites of the collateral order doctrine because the immunity is independent of the claims' merit, and the official's right to avoid defending against such claims would be lost if it could not be vindicated until an appeal following a final judgment on the merits. The first prerequisite of the collateral order doctrine, i.e., conclusive resolution of the collateral issue, is satisfied to the extent that the district court has denied the qualified-immunity motion as a matter of law, though not to the extent that the issue turns on the resolution of questions of fact. See, e.g., Behrens v. Pelletier, 516 U.S. 299, 313 (1996); Johnson v. Jones, 515 U.S. 304, 313-318 (1995); Mitchell v. Forsyth, 472 U.S. 511, 530 (1985); Tolbert v. Queens College, 164 F.3d 132, 138 (2d Cir. 1999); In re State Police Litigation, 88 F.3d 111, 124 (2d Cir. 1996).
 
 
 43
 Under the Harlow v. Fitzgerald standard, a government official sued in his individual capacity, see generally Hafer v. Melo, 502 U.S. 21, 25 (1991), is entitled to qualified immunity in any of three circumstances: (1) if the conduct attributed to him is not prohibited by federal law, see, e.g., County of Sacramento v. Lewis, 118 S. Ct. 1708, 1714 n.5 (1998); Siegert v. Gilley, 500 U.S. at 232; or (2) where that conduct is so prohibited, if the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time of the conduct, see, e.g., Harlow v. Fitzgerald, 457 U.S. at 817-19; or (3) if the defendant's action was "objective[ly] legal[ly] reasonable[] ... in light of the legal rules that were clearly established at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987) (internal quotation marks omitted); see Harlow v. Fitzgerald, 457 U.S. at 819. These three issues should be approached in sequence, for if the second is resolved favorably to the official, the third becomes moot; a favorable resolution of the first moots both the second and the third.
 
 
 44
 Thus, the initial question in the qualified-immunity inquiry should be whether the complaint sufficiently alleges the violation of a federal right, for "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert v. Gilley, 500 U.S. at 232. The defense of "qualified immunity requires some determination about the state of constitutional law at the time the officer acted," and the "better approach is to determine the right before determining whether it was previously established with clarity." County of Sacramento v. Lewis, 118 S. Ct. at 1714 n.5. The courts should not "assume[], without deciding, this preliminary issue" of whether the right exists. Siegert v. Gilley, 500 U.S. at 232.
 
 
 45
 The issue of "whether the plaintiff has asserted a violation of a constitutional right at all" is a "purely legal question." Id. If the complaint does not allege a cognizable federal claim, the defendant is entitled to have his qualified-immunity motion granted promptly as a matter of law. See, e.g., id.; Mitchell v. Forsyth, 472 U.S. at 526-30. If the complaint states a cognizable federal claim, the court should proceed to examine whether the right was clearly established at the time of the challenged conduct. That too is a question of law. See, e.g., Harlow v. Fitzgerald, 457 U.S. at 818 (district court may appropriately determine on summary judgment "not only the currently applicable law, but whether that law was clearly established at the time an action occurred"); Genas v. State of New York Department of Correctional Services, 75 F.3d 825, 830 (2d Cir. 1996) (same). Thus, when the district court has denied a qualified-immunity motion, its rulings that the plaintiff has sufficiently alleged the violation of a constitutional right and that--that right was clearly established at the time of the alleged conduct are immediately reviewable.
 
 
 46
 Where the district court bases its refusal to grant a qualified-immunity motion on the premise that the court is unable to, or prefers not to, determine the motion without discovery into the alleged facts, that refusal constitutes at least an implicit decision that the complaint alleges a constitutional claim on which relief can be granted. That purely legal decision does not turn on whether the plaintiff can in fact elicit any evidence to support his allegations; it thus possesses the requisite finality for immediate appealability under the collateral order doctrine. See, e.g., Siegert v. Gilley, 500 U.S. at 229-30 (sub silentio upholding immediate appealability of a district court order that "'[declin[ed]] to decide this [qualified immunity] matter on a Summary Judgment motion at this time'" because "the [district] court determined that '[it] would like to see a more developed record,' and therefore ordered 'a limited amount of discovery'"); Genas v. State of New York Department of Correctional Services, 75 F.3d at 830 (court of appeals has jurisdiction to review denial of qualified-immunity- based motion for summary judgment where denial "turns on an issue of lawwhether the given set of facts shows a violation of a federally protected right"). A district court's perceived need for discovery does not impede immediate appellate review of the legal questions of whether there is a constitutional right at all and, if so, whether it was clearly established at the time of the alleged conduct, for until "th[ese] threshold immunity question[s] [are] resolved, discovery should not be allowed." Siegert v. Gilley, 500 U.S. at 231 (internal quotation marks omitted); see also Smith v. Reagan, 841 F.2d 28, 31 (2d Cir. 1988) ("The failure of the district court to decide the State's [Eleventh Amendment immunity] motion does not alter the State's right to have an early determination of its claim of immunity. By holding the decision in abeyance pending the completion of all discovery in the case, the district court effectively denie[s] that right.").
 
 
 47
 In the present case, the district court ruled that the complaint sufficiently states a claim on which relief can be granted against Polonetsky and King for violation of plaintiffs' clearly established equal protection and freedom-of-association rights. We have jurisdiction to review those rulings immediately.
 
 B. The Nature of XMen's Claims
 
 48
 The essence of plaintiffs' claims is that their First Amendment and equal protection rights have been violated by the termination of their contract to provide security services at Ocean Towers and by their supposed exclusion from future such contracts. In ruling that XMen had stated claims on which relief can be granted, the district court relied primarily on Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1977), which established that a government employee is protected from discharge in retaliation for exercising his First Amendment rights unless the government employer can show that it would have discharged that employee even absent his protected conduct, see 429 U.S. at 28587. The district court relied on Sheppard v. Beerman, 94 F.3d 823, for the proposition that a qualified-immunity motion could not be granted based on the face of the complaint if the complaint alleges invidious motivation.
 
 
 49
 XMen, which was not a government employee but an independent contractor, relies in part on Board of County Commissioners v. Umbehr, 518 U.S. 668 (1996) ("Umbehr"), and O'Hare Truck Service, Inc v. City of Northlake, 518 U.S. 712 (1996) ("O'Hare"), in which the Supreme Court, some three months prior to the termination of XMen's Ocean Towers contract, "recognize[d] the right of independent government contractors not to be terminated for exercising their First Amendment rights," Umbehr, 518 U.S. at 686, of free speech, see id. at 673-74, or "political association," O'Hare, 518 U.S. at 715. XMen also argues that it had long been established that
 
 
 50
 to "condition the availability of benefits upon [a person's] willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." Sherbert v. Verner, 374 U.S. 398, 406 ... (1963). Public employment is among the benefits that should not be so conditioned. Perry v. Sindermann, 408 U.S. 593, 597 ... (1972).
 
 
 51
 Genas v. State of New York Department of Correctional Services, 75 F.3d at 831.
 
 
 52
 We have considerable difficulty with these positions because they misattribute to the legislators decisionmaking roles in the contracting process and give insufficient recognition to the nature of what the legislators are actually alleged to have done. The cases relied on by plaintiffs and the district court dealt with the rights of employees or independent contractors against the government agencies that decided whether or not they would receive, or retain, public employment or contracts. The defendants in those cases were the decisionmakers.
 
 
 53
 In the present case, it is plain that the legislators were not the decisionmakers. Although the district court's opinion stated that the legislators were alleged to have "excluded XMen from the 1994 bidding process," 983 F. Supp. at 112, and the complaint asserts that Polonetsky and King "participated in the decisions" to exclude XMen from the 1994 process (Complaint 48), there is no allegation in the complaint that the legislators had any authority to shape or supervise that process. Nor is there any allegation that, following the conclusion of that process, the legislators had any control over the award or renewal of contracts with respect to any given bidder. We note that the complaint does not make clear whether the decisionmakers were the private defendants, who owned and managed Ocean Towers, or DHCR, which regulated the bidding process and had the power to approve or disapprove the Ocean Towers security services contract, or the private defendants and DHCR acting jointly. For example, the complaint alleges that the 1993 contract for security services at Ocean Towers "was not required to be submitted to DHCR for prior approval" (Complaint 26), that the private defendants rejected all of the bids submitted during the 1994 bidding (see id. 49), and that DHCR "pressure[d]" the private defendants to terminate XMen's contract (id. 61); but it also alleges that "DHCR--through its Commissioner--always maintains discretion and can award the bids [sic] to someone other than the lowest bidder" (id. 48). What is clear from these allegations, however, is that no power to control the award of contracts resided in the legislators.
 
 
 54
 We note parenthetically that the district court dismissed the complaint against the State regulators on the ground that no concrete allegations were made against DHCR, and found that the concrete allegations that were made with regard to the private defendants plainly revealed that those defendants favored retaining XMen. For example, the private defendants elected to retain XMen following the expiration of the 1993 contract despite the fact that XMen did not even submit a bid in the 1994 bidding: DU and BSR recommended to DHCR that all of the bids that were submitted be rejected and that there be new bidding; and that is precisely what occurred. (See Complaint 49, 50, Exhibit A.) Thus, the persons who were the decisionmakers have been dismissed from the case on the ground that they are not alleged to have engaged in conduct that was wrongful.
 
 
 55
 XMen's month-to-month contract was terminated in 1996 following the 1995 bidding, in which XMen did not submit the low bid (see Complaint 64). There is no allegation that the legislators had any authority or control over which bid was accepted. Accordingly, the existence of a constitutional right on the part of XMen against Polonetsky and King is not established by cases stating that employees or independent contractors have rights against decisionmakers.
 
 
 56
 C. The Conduct Attributed to the Legislators
 
 
 57
 The conduct attributed by the complaint to the legislators is that they made accusations against XMen, asked government agencies to conduct investigations into its operations, questioned XMen's eligibility for an award of a contract supported by public funds, and advocated that XMen not be retained. We are aware of no constitutional right on the part of the plaintiffs to require legislators to refrain from such speech or advocacy.
 
 
 58
 The First Amendment guarantees all persons freedom to express their views. The scope of permitted expression is broad; "insults that contain neither threats of coercion that intimidate nor fighting words that create the possibility of imminent violence, see Chaplinsky v. New Hampshire, 315 U.S. 568, 572 ... (1942), must be tolerated." Pro-Choice Network of Western New York v. Schenck, 67 F.3d 377, 395-96 (2d Cir. 1995) (en banc) (Winter, J., joined by a majority of the Court, concurring), rev'd in part on other grounds, 519 U.S. 357 (1997). And "[i]t is well settled that the Constitution does not permit the imposition of liability for expressing socalled 'false ideas.'" Hammerhead Enterprises, Inc. v. Brezenoff, 707 F.2d 33, 40 (2d Cir.) (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 339340 (1974)), cert. denied, 464 U.S. 892 (1983). "[C]onstitutional protection does not turn upon 'the truth, popularity, or social utility of the ideas and beliefs which are offered,'" for "erroneous statement is inevitable in free debate, and ... must be protected if the freedoms of expression are to have the 'breathing space' that they 'need ... to survive.'" New York Times Co. v. Sullivan, 376 U.S. 254, 271-72 (1964) (quoting N.A.A.C.P. v. Button, 371 U.S. 415, 433, 445 (1963)); see also New York Times Co. v. Sullivan, 376 U.S. at 279 n.19 ("Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.'" (quoting John Stuart Mill, On Liberty 15 (Oxford: Blackwell, 1947)).
 
 
 59
 One does not lose one's right to speak upon becoming a legislator.
 
 
 60
 It is well known, of course, that Members of the Congress engage in many activities other than the purely legislative activities protected by the Speech or Debate Clause. These include a wide range of legitimate 'errands' performed for constituents, the making of appointments with Government agencies, assistance in securing Government contracts, preparing socalled 'news letters' to constituents, news releases, and speeches delivered outside the Congress. The range of these related activities has grown over the years. They are performed in part because they have come to be expected by constituents, and because they are a means of developing continuing support for future elections.
 
 
 61
 United States v. Brewster, 408 U.S. 501, 512 (1972) (emphasis added). "Members of Congress are constantly in touch with the Executive Branch of the Government and with administrative agenciesthey may cajole, and exhort with respect to the administration of a federal statute ...." Gravel v. United States, 408 U.S. 606, 625 (1972). Although these types of communications are political rather than legislative in nature, and hence do not come within the absolute protection afforded by the Speech or Debate Clause, they are "entirely legitimate" acts, United States v. Brewster, 408 U.S. at 512, performed in the legislator's "official capacity," Gravel v. United States, 408 U.S. at 625, and are protected by the First Amendment:
 
 
 62
 The manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy. The central commitment of the First Amendment, as summarized in the opinion of the Court in New York Times Co. v. Sullivan, 376 U.S. 254, 270 (1964), is that "debate on public issues should be uninhibited, robust, and wideopen." ... Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected. The State argues that the New York Times principle should not be extended to statements by a legislator because the policy of encouraging free debate about governmental operations only applies to the citizen-critic of his government. We find no support for this distinction in the New York Times case or in any other decision of this Court. The interest of the public in hearing all sides of a public issue is hardly advanced by extending more protection to citizen-critics than to legislators.
 
 
 63
 Bond v. Floyd, 385 U.S. 116, 135-36 (1966) (emphases added).
 
 
 64
 In sum, just as the First Amendment protects a legislator's right to communicate with administrative officials to provide assistance in securing a publicly funded contract, so too does it protect the legislator's right to state publicly his criticism of the granting of such a contract to a given entity and to urge to the administrators that such an award would contravene public policy. We see no basis on which XMen could properly be found to have a constitutional right to prevent the legislators from exercising their own rights to speak. Cases holding that a decisionmaker may not take action for impermissible reasons do not provide the proper analytical framework for claims against persons who are not decisionmakers but merely advocates. Accord Vickery v. Jones, 100 F.3d 1334, 1345-46 (7th Cir. 1996) (recommending the hiring or non-hiring "of a specific person to perform a governmental function" is a constitutionally protected "political expression"; an "outcome to the contrary could have the effect of subjecting ... legislators ... to claims of unlawful conduct each time they advocated the hiring of a particular individual"), cert. denied, 520 U.S. 1197 (1997).
 
 
 65
 To the extent that plaintiffs mean to assert that the rights of XMen's employees to associate with others with whom they share religious beliefs should take precedence over other persons' speech rights, they are wrong.
 
 
 66
 [I]t may be doubted that any of the great liberties insured by the First A[mendment] can be given higher place than the others. All have preferred position in our basic scheme. Schneider v. State, 308 U.S. 147 [(1939)]; Cantwell v. Connecticut, 310 U.S. 296 [(1940)]. All are interwoven there together. Differences there are, in them and in the modes appropriate for their exercise. But they have unity in the charter's prime place because they have unity in their human sources and functionings. Heart and mind are not identical. Intuitive faith and reasoned judgment are not the same. Spirit is not always thought. But in the everyday business of living, secular or otherwise, these variant aspects of personality find inseparable expression in a thousand ways. They cannot be altogether parted in law more than in life.
 
 
 67
 Prince v. Massachusetts, 321 U.S. 158, 164-65 (1944).
 
 
 68
 No case of which we are aware has recognized a right in any individual under the First Amendment or the Equal Protection Clause, or any other constitutional provision, to prevent legislators from exercising their rights merely to express their views. To the contrary, we have noted that where a public official, without engaging in any threat, coercion, or intimidation, "exhort[ed]" private entities not to distribute a board game whose ideas the official viewed as pernicious, the official's speech did not violate any constitutional right of the game's authors. Hammerhead Enterprises, Inc. v. Brezenoff, 707 F.2d at 39 & n.6. Although a person who conjoined such arguments with threats or coercion would be vulnerable to liability, see, e.g., Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc., 968 F.2d 286, 296-97 (2d Cir. 1992) (defendant's threat of economic boycott to coerce third party to violate state anti-discrimination statute), and although a state agency that was a decisionmaker would be exposed to liability if it made its decision based on unlawful considerations that were argued to it, see, e.g., United States v. Yonkers Board of Education, 837 F.2d 1181, 1223-26 (2d Cir. 1987), cert. denied, 486 U.S. 1055 (1988), speech by persons who are not decisionmakers and who merely engage in advocacy without threats, intimidation, or coercion is protected by the First Amendment. The "critical line for First Amendment purposes must be drawn between advocacy, which is entitled to full protection, and action, which is not." Healy v. James, 408 U.S. 169, 192 (1972).
 
 
 69
 In the present case, as discussed in Part II.B. above, Polonetsky and King are not alleged to have had any power or authority to decide who would be awarded contracts to provide services at Ocean Towers. As to what the legislators are alleged to have done, the complaint contains several charges of "participation" in a "conspiracy" that are conclusory, and are for that reason insufficient to state a claim, see, e.g., Thomas v. Roach, 165 F.3d 137, 147 (2d Cir. 1999); Ostrer v. Aronwald, 567 F.2d 551, 553 (2d Cir. 1977) (per curiam), along with a few concrete allegations. It is to the specific allegations that we look to determine whether a constitutional violation is alleged.
 
 
 70
 What the legislators are alleged to have done is to express their views. The only concrete acts ascribed to them are attending meetings, making statements, and writing letters. The statements attributed to the legislators are that they accused XMen of being controlled by the Nation of Islam and Farrakhan (Complaint 42), of being part of a "hate group" that practiced racism, gender discrimination, anti-semitism, and other religious discrimination (id. 44, 45), of being fraudulently mismanaged (see id. 44), and of forcing its religious views on the Ocean Towers tenants by distributing religious literature while on duty (see id. 43); and the legislators are alleged to have "ridiculed" HUD findings to the contrary (id. 56) and to have urged that XMen not be retained (see, e.g., id. 55, 56, 59). Even if false, as alleged by the complaint, the legislators' statements are entitled to First Amendment protection.
 
 
 71
 While the complaint alleges that the legislators exerted "pressure" on the decisionmakers, there is no allegation that such "pressure" took the form of anything other than speech. Though they are alleged to have communicated with State and federal regulators, a Congressional committee, and the public, the legislators are not alleged to have threatened the decisionmakers in any way or to have engaged in coercive or intimidating conduct. Rather, the concrete allegations of the complaint are typified in its quotation of Polonetsky's letter to DHCR, in which King is alleged to have concurred, which stated as follows:
 
 
 72
 "Since the Nation of Islam promotes hatred against whites, Jews, women, Catholics and others, it is difficult to understand how the XMen are eligible for a state supported contract - which requires compliance with equal employment and non-discrimination guidelines. It seems clear that state support for this contract subsidizes the activities of a hate group and helps fund the racist and anti-Semitic goals of Louis Farrakhan and the Nation of Islam."
 
 
 73
 (Complaint 45.) We see neither in this letter nor in any of the other allegations of the complaint any semblance of threat, coercion, or intimidation by the legislators.
 
 
 74
 To the extent that the complaint's references to "pressure" might be read to allege that the legislators threatened the decisionmakers with legislation, such a threat could not be the basis of a civil claim, for legislators enjoy absolute immunity for legislative acts, regardless of their motivation. See generally Bogan v. Scott-Harris, 118 S. Ct. 966, 973, 140L.Ed.2d 79 (1998) ("Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it."); Tenney v. Brandhove, 341 U.S. 367, 371, 377 (1951) (legislator entitled to absolute immunity for allegedly singling out plaintiff for investigation in order "to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights" (internal quotation marks omitted); "[t]he claim of an unworthy purpose does not destroy the privilege"; it is "not consonant with our scheme of government for a court to inquire into the motives of legislators" acting in their legislative capacity).
 
 
 75
 We note also that as to the allegation that the legislators instigated investigations by HUD and a Congressional committee into XMen's operations, the district court dismissed the claim against King on the ground that he is entitled to absolute immunity for such action. That claim was asserted against both of the legislators, and it presumably remains pending against Polonetsky. Plainly, however, the First Amendment gives any citizen the right to petition the government; that right is not lost by reason of the citizen's ascendance to legislative office. XMen had no right to foreclose such communications.
 
 
 76
 Finally, we note that although XMen purports to assert an equal protection claim for selective treatment, the complaint itself undercuts such a claim with respect to the decisionmakers. Although the complaint alleges that the 1996 contract was eventually awarded to a company that did not submit a bid in the 1995 bidding, that is precisely the treatment that XMen itself had received previously: XMen did not submit a bid in the 1994 bidding, but it was retained. Thus, the principal action by the decisionmakers of which XMen complains paralleled the prior action of which XMen had been the beneficiary. And as for XMen's equal protection claims against the legislators, who are sued not for actions but rather for their speech, there simply is no equal protection right not to be singled out for criticism.
 
 CONCLUSION
 
 77
 We have considered all of XMen's arguments in support of the district court's denial of the legislators' qualified-immunity defenses and have found in them no basis for affirmance. The complaint's allegations that the legislators made disparaging, accusatory, or untrue statements about XMen fail to state a claim for violation of XMen's constitutional rights. Polonetsky and King are thus entitled to qualified immunity on those claims.
 
 
 78
 The order of the district court denying the qualified-immunity motions is reversed, and the matter is remanded for such further proceedings as are not inconsistent with this opinion.
 
 
 
 Notes:
 
 
 *
 Honorable Charles S. Haight, Jr., Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.