**William GRATSCH, Plaintiffs,**

v.

**HAMILTON COUNTY SHERIFF'S DEPARTMENT, et al., Defendants.**

**No. C–1–97–964.**

United States District Court, S.D. Ohio, Western Division.

March 24, 2000.

Marc David Mezibov, Sirkin Pinales Mezibov & Schwartz, Cincinnati, OH, Ted L Wills, Cincinnati, OH, for William R Gratsch, plaintiff.

John Joseph Arnold, Hamilton County Prosecuting Attorney, Cincinnati, OH, Christian Joseph Schaefer, Hamilton County Prosecutor, Civil Unit, Cincinnati, OH, Kathleen Mary Elfers, Hamilton County Prosecutor Juvenile, Cincinnati, OH, for Hamilton County Sheriff's Department, defendant.

Christian Joseph Schaefer, Kathleen Mary Elfers, Francis David Albanese, Cincinnati, OH, for Eastern Hamilton County Special Deputy Sheriffs Unit, defendant.

ORDER GRANTING DEFENDANT EASTERN COUNTY SPECIAL DEPUTY UNIT'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, DENYING PLAINTIFF'S MOTION FOR JUDICIAL ESTOPPEL, AND DISMISSING PLAINTIFF'S SUBSTANTIVE DUE PROCESS CLAIM

DLOTT, District Judge.

This matter comes before the Court on Defendants' Motions for Summary Judgment (docs. 25 and 27) and Plaintiff's Motion for Judicial Estoppel (doc. 44). This Court held a hearing on October 28, 1999 at which time the parties presented their arguments. Plaintiff William Gratsch, who worked as a special deputy for the Hamilton County Sheriff's Department, filed suit against the Hamilton County Sheriff's Department ("Sheriff's Department"); the Eastern County Special Deputy Unit ("Eastern Unit"); Simon Leis, Sheriff of Hamilton County; Don Rabold, Special Deputies Commander; John Bowles, special deputy; and Joe Corry, special deputy. Gratsch alleges that Defendants terminated him in contravention of his First and Fourteenth Amendment rights. He contends that he was: 1) fired for engaging in constitutionally protected speech, and 2) denied the due process to which he was entitled prior to his termination.

Defendants move for summary judgment, arguing: 1) that Gratsch's speech was not constitutionally protected because he knew his statements were false, and 2) that Gratsch was a volunteer who had no property interest in his special deputy commission and was thus not entitled to a hearing before termination. The individual Defendants also claim that they should have qualified immunity for the acts at issue.

In a separate Motion for Summary Judgment (doc. 27), the Eastern Unit argues that the claims against it should be dismissed. The Unit asserts that it is not a state actor for purposes of § 1983, and, with regard to Gratsch's state claims, it should not be held liable for the actions of special deputies Bowles and Corry because it is not their employer.

Finally, in his Motion for Judicial Estoppel (doc. 44), Plaintiff argues that Defendants should be prevented from arguing that he is employed by the private merchants for whom he works private details because Defendants have taken an inconsistent position in another judicial proceeding.

Upon consideration of the facts and law, the Defendants' Motion for Summary Judgment (doc. 25) is **DENIED,** the Eastern Unit's Motion for Summary Judgment (doc. 27) is **GRANTED,** and the Plaintiff's Motion for Judicial Estoppel is (doc. 44)

**DENIED.** Furthermore, the Court dismisses *sua sponte* the substantive due process claim which Plaintiff makes in Count Two of his Complaint.

## I. BACKGROUND

Beginning in July 1983, Plaintiff William Gratsch began working as a special deputy in the Eastern Unit. According to a Sheriff's Department fact sheet, a special deputy is a "volunteer non-paid officer with the Sheriff's Department, who [provides] auxiliary or supplemental assistance to various regular activities of the Sheriff's Department." Ex. # 1058. For example, special deputies provide law enforcement services at private premises such as Coney Island, River Downs, or church festivals. This service is called a "private duty detail." Special deputies also ride with regular deputies on vehicle patrols, assist the patrol clerk with desk duties, transport prisoners, and perform special security or traffic duties. *See* Ex. # 2.

Gratsch's lawsuit stems from his termination from the Eastern Unit in October 1996. The Court will briefly summarize the incidents which led up to Gratsch's termination.

### Incident with Joann Taylor

The first occurrence which is relevant to this proceeding occurred on March 4, 1995. Gratsch went on an assignment with a special deputy trainee, Joann Taylor. Taylor claimed in a letter to Defendants Bowles and Corry that: 1) during a traffic stop and while observing some buildings and a seemingly abandoned pick-up truck, Gratsch put her in a vulnerable position; 2) he shined a spotlight at her while observing the truck and inhibited her vision; and 3) when she tried to roll up the car window because she was cold, Gratsch activated a lock-up switch which prevented her from rolling up the window and said "try to roll it up now."

### Gratsch's Demotion and Suspension

In response to Taylor's complaints, on May 18, 1995, Lieutenant Corry recommended that Gratsch be demoted from the rank of sergeant to patrol officer and placed on a one-year period of probation. In July 1995, Sheriff Leis followed Lieutenant Corry's recommendation.

The parties disagree about whether Gratsch agreed to these terms. Captain Bowles states that he and Lieutenant Corry spoke with Gratsch, and all agreed to the demotion and probation. However, Gratsch states that in July 1995, he complained to his supervisors that he was entitled to a hearing with representation from an attorney before this action was taken. Gratsch claims that, in response to his request for a hearing, Defendants Corry and Bowles recommended that Gratsch be further disciplined for insubordination. Captain Bowles states, however, that Gratsch was disciplined not for requesting a hearing, but for walking out of a unit meeting against orders and going outside of the chain of command in challenging his demotion. Gratsch claims that in November 1995, he complained to Defendant Don Rabold, Special Deputies Commander, about being disciplined without a hearing. In December 1995, Defendant Bowles informed Gratsch that he was suspended for two months for insubordination.

### Gratsch's Allegations of Unethical Behavior in the Eastern Unit

Also in December 1995, Gratsch wrote a letter to Defendant Rabold about the possible misuse of Eastern Unit funds and other inappropriate behavior on the part of Defendant Bowles. In the letter, Gratsch made several accusations. First, Gratsch stated that Bowles asked him and another special deputy, Shawn Robinson, to work a private duty detail for Bowles' wife's birthday party. Gratsch claims that Bowles proposed to pay them with unit funds, but Gratsch agreed to work the detail without pay. Second, Gratsch alleged that someone was signing his name as co-signer on Eastern Unit checks without his permission. Third, Gratsch claimed that Bowles abused his position by soliciting a discount on a ham at the Honey Baked Ham store.

## Defendant Rabold's Investigation of Gratsch's Accusations

In response to these allegations, Defendant Rabold conducted an investigation. With regard to Gratsch's claim that Bowles attempted to use unit funds to pay Gratsch and Shawn Robinson to work at his wife's birthday party, Rabold reported:

> The ... allegation that Capt. Bowles charged the cost of the officer working traffic at his wife's birthday party in 1994 is accurate. S/D Shown (sic) Robinson received $48.00 in a unit paycheck for working the private party hosted by S/D Bowles. This expenditure was not approved before or after the party.... When interviewed, S/D Bowles stated that this in fact did occur and that he did not see anything wrong with this, it was "captain's expenses," and that at a unit meeting subsequent to the party the unit voted and approved this expense. (This did not occur.) He later, in his written explanation, claimed that he intended to reimburse the unit but forgot.

Ex. # 6.

Next, Rabold found that Sergeant Gene O'Connor had been signing Gratsch's name to unit checks for a number of years, but that Gratsch knew and approved of this practice. Rabold found that:

> The unit checks do require two authorized signatures, S/D Bill Gratsch's being one of them and the unit book-keeper S/D Gene O'Connor being the other. For at least the past three years S/D O'Connor has been signing Gratsch's name on the checks with Gratsch's knowledge and permission in that Gratsch had moved to Colerain Twp. and was not physically present to sign the checks to pay unit bills. Prior to this S/D Gratsch had been pre-signing blank checks for the same purpose at unit meetings, due to his being unavailable to be present when S/D O'Connor paid unit bills. S/D Gratsch has been receiving unit pay checks for a number

of years with his signature signed by S/D O'Connor without complaint.

Ex. # 6. Rabold concluded that Gratsch had "misrepresented the check signing allegation and presented it in writing as potentially a criminal act, forgery or embezzlement." Ex. # 6.

With regard to Gratsch's discount-solicitation allegation, Rabold stated that Captain Bowles did receive a discounted ham in April of 1995. Rabold explained, however, that Bowles claimed he only paid the price presented by the manager. Rabold concluded that this issue was not of concern because no one from the business had complained.

Finally, Rabold reported that each year, Captain Bowles had submitted hand-written expense vouchers on index cards for personnel expenses ranging from $375 to $475 over a period of five years. Rabold stated that "no receipts or other documentation for these receipts was offered or required." Ex. # 6.

As a result of these findings, Defendant Rabold ordered an audit of all four special deputy units and required Captain Bowles to produce receipts or to justify his expenditures.

Along with the investigation results, Rabold wrote:

> While one of S/D Gratsch's allegations was accurate, he misrepresented the check signing allegation and presented it in writing as potentially a criminal act, forgery or embezzlement. He also violated my direct instructions to come to me with any other problems with Capt. Bowles at a face to face meeting prior to his letter. He has threatened the unit leadership with legal action as a result of legitimate disciplinary actions taken and has generally been antagonistic to any type of corrective actions by his unit leadership. When the audit is completed, regardless of the results, I will be

recommending his termination from the special deputy program as well.

Ex. # 6.

### Gratsch's Termination

On October 21, 1996, Defendant Rabold notified Gratsch that his special deputy commission was canceled. The memorandum to Gratsch's personnel file stated that the following incidents evinced his failure to perform his duties: 1) his demotion due to the poor judgment he showed when training Joann Taylor; 2) his accusations of theft, forgery and embezzlement against Bowles and O'Connor which were investigated by Rabold and found to be "without basis;" 3) his absence from monthly unit meetings beginning in January 1996 and failure to document required county service time; 4) his behavior when Rabold attempted to interview him in April 1996;[1] 5) his failure to submit monthly off-duty detail records; and 6) his "failure to quality [sic] with his firearm with his unit in 1997." Ex. # 46. The memorandum then identified the specific Procedure Memoranda and Sheriff's Office Rules and Regulations which Gratsch's actions had violated.

### II. SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Federal Rule of Civil Procedure 56. Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). On a motion for summary judgment, the movant has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can permissibly be drawn therefrom, must be viewed in the light most favorable to the party opposing the motion. *See Matsushita Elec. Indus. Co.*

*v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The moving party may support the motion for summary judgment with affidavits or other proof or by exposing the lack of evidence on an issue for which the nonmoving party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On those issues for which it shoulders the burden of proof, the moving party must make a showing that is " 'sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.' " *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)) (emphasis omitted). For those issues where the moving party will not have the burden of proof at trial, the movant must "point[ ]out to the district court ... that there is an absence of evidence to support the nomoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. 2548.

In responding to a summary judgment motion, the nonmoving party may not rest upon the pleadings but must go beyond the pleadings and "present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party "must set forth specific facts showing there is a genuine issue for trial." Fed.R.Civ.Pro. 56(e). If the defendant moves for summary judgment based on the lack of proof of a material fact, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to overcome the summary judgment motion. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Thus, "[i]f the evidence is merely colorable, or is not significantly probative, sum-

---

**1.** Rabold claimed that Gratsch refused to be interviewed without his wife present. His wife then threatened legal action. Finally, he

agreed to the interview without his wife but attempted to record the interview with a hidden recorder.

mary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## III. ANALYSIS

■ First, the Court will address Defendants' qualified immunity claims. Immunity is a threshold question that must be addressed before consideration of the merits of a case. *See Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

### A. Qualified Immunity

■ Under the doctrine of qualified immunity "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* To determine whether a right is clearly established, a district court should ordinarily find binding precedent by the Supreme Court, the court of appeals in the circuit in which it sits, or itself. *See Ohio Civil Serv. Employees Ass'n v. Seiter,* 858 F.2d 1171, 1177 (6th Cir.1988).

■ For a right to be "clearly established," courts must have recognized something more than a general, abstract right. The Supreme Court has advised:

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Daugherty v. Campbell,* 935 F.2d 780, 784 (6th Cir.1991) *(quoting Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

■ However, before determining whether Defendants are entitled to qualified immunity, the Court must answer a threshold question: "Did the plaintiff[ ] sufficiently allege [a] violation of a constitutionally or statutorily protected right?" *Mattox v. City of Forest Park,* 183 F.3d 515, 520 (6th Cir.1999); *see also Blair v. Meade,* 76 F.3d 97, 100 (6th Cir.1996) ("[w]hen a court determines whether qualified immunity exists, it must first ask whether the plaintiff has asserted a violation of a constitutional right at all."). If the Plaintiff does not allege a constitutional violation, it is fatal to his case. *See Mattox,* 183 F.3d at 520. Thus, after determining whether Gratsch has stated a violation of his constitutional rights, the Court then determines whether Defendants actions "were objectively unreasonable in light of the clearly established constitutional right." *Bloch v. Ribar,* 156 F.3d 673, 678 (6th Cir.1998).

### 1. First Amendment Retaliation Claim

The Court denies qualified immunity to the Defendants on this claim. The Court finds that Gratsch has stated a violation of clearly established law, and a reasonable official would have understood that Defendants' actions were unlawful in light of the law at the time of Gratsch's termination.

First, the Court finds that Gratsch has properly alleged a violation of his rights. Gratsch claims that he was retaliated against for engaging in protected speech. The context within which Gratsch's claim arises is complex. Gratsch asserts that he is a public employee, and that the Hamilton County Sheriff is his employer. However, the Sheriff claims that Gratsch is not an employee, but an unpaid volunteer.

It is important to note at the outset that Gratsch's employment status is irrelevant to his right to free speech. The Supreme Court has made it clear that the "government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected ... freedom of speech' even if he has no entitlement to that benefit." *Board of County Comm'rs v. Umbehr,* 518

U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996) (*quoting Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)). *See also O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 725–26, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) ("Government officials may indeed terminate at-will relationships, unmodified by any legal constraints, without cause; but it does not follow that this discretion can be exercised to impose conditions on expressing, or not expressing, specific ... views.").

■ However, the existence of an employment relationship is relevant when determining the legal rules to apply to a particular instance of alleged First Amendment retaliation. *See Thaddeus–X v. Blatter,* 175 F.3d 378, 388–89 (6th Cir.1999) ("Standing in a city park ... at a rally, a citizen is free to say almost anything without interference from the government.... Standing in his office at a state agency, an employee is free to speak up about matters of public concern; his government employer enjoys wide latitude in limiting other speech to enable the office to function properly and efficiently.") (internal quotation marks and citation omitted). Thus, when the speaker is a public employee, his right to express himself must be balanced against the state's interests as an employer. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Umbehr,* 518 U.S. at 676, 116 S.Ct. 2342 ("In striking [the balance between the interests of the public employee and employer], we have concluded that the government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.").

■ The Court finds that, regardless of whether Gratsch is an employee or a volunteer, the test applicable to public employees' speech outlined by the Supreme Court in *Pickering* is appropriate in this case because the government is functioning more as an employer than as a sovereign. *See Umbehr,* 518 U.S. at 673, 116 S.Ct. 2342 (applying the *Pickering* test in a First Amendment retaliation case in which the plaintiff was an independent contractor); *Havekost v. United States Dep't of the Navy,* 925 F.2d 316, 318 (9th Cir.1991) (applying the *Pickering* test in a case in which the Plaintiff did not have an employment contract with the Navy, but rather a "revocable grant of permission to work for customer tips" as a grocery bagger.).

■ In *Pickering,* the Supreme Court clarified that the Constitution protects the right of public employees to comment on matters of public concern. 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). To make out a claim of First Amendment retaliation in the public employment context, a plaintiff must first show that his speech regarded a matter "of public concern." *Connick v. Myers,* 461 U.S. 138, 145, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If a government employee's speech is not of public concern, it is "unnecessary for [a court] to scrutinize the reasons for [the employee's] discharge." *Id.* at 146, 103 S.Ct. 1684. However, if a court determines that the employee's speech was of public concern, the court must weigh the employee's interest in commenting upon matters of public concern and the "interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering,* 391 U.S. at 568, 88 S.Ct. 1731; *Jackson v. Leighton,* 168 F.3d 903, 909 (6th Cir.1999). Next, the plaintiff must show that the protected speech was a substantial and motivating factor in the adverse employment decision. *See Barnes v. McDowell,* 848 F.2d 725, 732–33 (6th Cir.1988). Finally, if a court finds in favor of the employee, a state employer can still escape liability if it can show that it would have taken the same employment action without regard to the employee's speech. *See Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429

U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Jackson* 168 F.3d at 909.

■ Applying the *Pickering* test, the Court finds that Gratsch has stated a violation of his First Amendment rights. The first issue before the Court is whether Gratsch's speech was of public concern and thus protected by the Constitution. The protected status of speech is an issue of law for the Court to decide. *See Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. 1684. The Supreme Court describes speech of public concern to be speech "relating to any matter of political, social, or other concern to the community." *Connick,* 461 U.S. at 146, 103 S.Ct. 1684.

■ Gratsch's speech was essentially an allegation of unethical conduct in the Eastern Unit. He charged that: 1) Bowles offered to pay him and another special deputy with unit funds to work at Bowles' wife's birthday party, 2) Bowles solicited a discount from a merchant, and 3) someone was signing his name as co-signer on Eastern Unit checks without his permission.

■ The Court finds that possible unethical behavior by special deputies is a matter of public concern. "[M]atters of public concern include misuse of public money, unethical or illegal practices in an office, or corruption." *Wilkins v. Jakeway,* 1996 WL 84649 at *5 (6th Cir.1996) (unpublished). Special deputies derive their power from the state, are regulated by the state, and often are considered to be acting on behalf of the state. Special deputies derive their authority from the Sheriff and are recognized in Ohio common law as deputies under R.C. § 311.04. *See 1977 Ohio Op.Atty Gen. No. 77–027.* They are subject to the Sheriff's rules and regulations. *See* Ex. # 2. Further, although special deputies spend much of their time working details for private merchants, they are often considered to be acting in their official capacity even when on a private detail. *See Ayers v. Woodard,* 166 Ohio St. 138, 143, 140 N.E.2d 401 (1957) (deputy sheriff was acting in his official capacity even though he was on duty as a security guard for a private employer). Further, it is the Sheriff—not the private merchants for whom the special deputies serve private details—who has the power to hire, fire, and discipline the special deputies. *See State ex rel. Geyer v. Griffin,* 80 Ohio App. 447, 458, 76 N.E.2d 294 (1947) ("A sheriff is vested with absolute discretion to determine what deputies shall be employed [and] the length or their employment...."). Certainly, in light of the state imprimatur placed on the operation of special deputies, corruption in a special deputy unit is of public concern.

■ Next, the Court must determine whether the potential injury to the employer outweighed Gratsch's interest in expression. The Court holds that Gratsch's speech is of sufficient importance, when weighed against the scarce evidence presented by Defendants, to tip the *Pickering* balance in Gratsch's favor.

■ It is likely true that if Gratsch would have remained in the program, there would have been tension between Gratsch and Defendants. Indeed, any time a public employee charges his superiors or co-workers with corruption, it is likely to cause turmoil in the office. However, the mere assertion that a charge of unethical behavior will result in turmoil is insufficient to render the speech unprotected, because the importance of speech is at its "zenith" when it concerns public corruption. *Marohnic v. Walker,* 800 F.2d 613, 616 (6th Cir.1986) ("Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law...."). Here, Defendants have presented no evidence, just an assertion, that Gratsch's speech would have been disruptive if he would have remained in the program. Weighing speech which is at the "zenith" of importance against a mere assertion that the speech would have disrupted the functioning of the Eastern Unit, the Court finds that Gratsch's claim survives the *Pickering* balance test.

■ Finally, the Court must determine if Gratsch has alleged facts and produced evidence which show that his speech was a substantial and motivating factor in his termination. The Court finds that Gratsch has produced enough evidence to create a genuine issue as to whether his speech motivated Defendants to terminate him. It is undisputed that Gratsch sent a letter to Rabold in December 1995 alleging unethical behavior in the Eastern Unit. It is also undisputed that Sheriff Leis terminated Gratsch in October 1996. A memorandum to Gratsch's personnel file stated that one of the reasons for his termination was his accusations against Bowles and O'Connor. *See* Ex. # 46. The letter also listed as causes of Gratsch's termination: his poor judgment while training Joann Taylor, his absence from monthly unit meetings, and his belligerent behavior when Captain Rabold attempted to interview him.

The Court finds that Gratsch has alleged facts and produced evidence sufficient to create a genuine issue as to whether his speech was a motivating factor in his termination. The memorandum to Gratsch's file clearly lists his allegations of wrongdoing as a cause for his dismissal. While the Court does not know how much weight the Defendants placed on each factor, Gratsch has certainly produced enough evidence to make this a genuine issue of fact.

As an affirmative defense, Defendants assert that Gratsch would have been terminated regardless of his speech because he constructively abandoned his position when he ceased to perform his voluntary duties for approximately six months. Gratsch produces evidence that he was absent during this time period only because Defendants suspended him from the unit and stopped scheduling him for details. Defendant Bowles admitted that Gratsch was not scheduled for details:

> Captain Rabold said to have no more communication with him. He came to the meetings, but we didn't put him on the schedule, because with this thing pending, we was afraid he might do something that was detrimental to the Unit or the Department and we didn't want that to happen, so we didn't schedule him for details.

Bowles Dep. at 72–73.

The Court finds that Gratsch has produced enough evidence which tends to show that he did not abandon his position to create a genuine issue of fact as to this matter.

■ Having determined that Gratsch has stated a constitutional violation, the Court must now address the Defendant's request for qualified immunity. Gratsch's right to speak on matters of public concern was clearly established at the time of his termination. *See Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). However, Defendants argue that a reasonable official would not have thought Gratsch's speech was protected because he would have considered the speech to be knowingly false. The Constitution does not protect statements which are knowingly or recklessly false. *See Gossman v. Allen,* 950 F.2d 338, 342 (6th Cir.1991). However, the actual truth or falsity of Gratsch's speech is not at issue in a qualified immunity analysis. *See id.* Instead, the Court must determine whether a reasonable official could believe that Gratsch knowingly or recklessly made false allegations. *See id.* "If an official reasonably believes that an employee made statements with knowledge of, or reckless indifference to, their falsity, the official would conclude that the employee could be fired without offending the First Amendment." *Id.*

■ Defendants allege that Gratsch's charges regarding the forgery of his name and the birthday party incident were knowingly false. First, Defendants contend that Gratsch's charge regarding Bowles' wife's birthday party was untrue because Gratsch was not bullied into serving private duty, but voluntarily agreed to do it without pay as a birthday gift. Addi-

tionally, they assert that Gratsch's claim that he "recently discovered someone was signing his name on checks," is disingenuous because Gratsch allowed Sergeant O'Connor to sign his name.

The evidence regarding the birthday party incident supports Gratsch's charge of misuse of unit funds. Rabold reported that Bowles used unit money without unit approval to pay a special deputy for working at his wife's birthday party. *See* Ex. # 6. Gratsch charged that Bowles had offered to pay him and Shawn Robinson with unit funds for working at his wife's party. Thus, Defendants' own version of events basically confirms Gratsch's allegation. It is irrelevant whether Bowles bullied Gratsch, or Gratsch worked voluntarily. Gratsch alleged that Unit money was misused, not that he was forced to work at the party.

The evidence regarding Gratsch's forgery allegation is unclear. The evidence indicates that Gratsch never performed his check-signing duty, and allowed Sergeant O'Connor to sign his name for several years. This evidence makes it seem reasonable for an official to view Gratsch's claim to have "recently discovered" that someone was signing his name as knowingly false. However, Gratsch explains that his concern was triggered because he noticed that his name was still being signed after his termination, and he feared that he would be implicated if Bowles wrongly spent or took unit money using a check with his name on it. The Court finds that there is a genuine issue as to whether a reasonable official could have viewed this claim as knowingly false.

Although Defendants do not argue that Gratsch's claim that Bowles solicited a discount from a merchant is false, the facts regarding this incident support Gratsch's account. Rabold's investigation revealed that Bowles did receive a discount on a ham. *See* Ex. # 6. Bowles explains the incident as follows:

> The third complaint concerned a discount on a Honey Baked Ham allegedly received by me some nine months prior to Plaintiff's Interdepartmental Correspondence. When I or any other special deputy is working paid details for private employers, we are regarded as employees of the private employer. I knew that the policy of the Honey Baked Ham Store was that clerks gave deputies a small discount and the manager would on occasion give more of a discount. I suggested to Plaintiff that he wait until a manager could wait on him so he could also get a larger discount.

Bowles Aff. at 64–67.

It is unclear whether Bowles used his position of authority to solicit the discount or the merchant gave Bowles the discount because it thought of him as an employee who should receive an employee discount. This distinction is important. The Hamilton County Sheriff's Office Rules/Regulations and Procedures state:

> 2.39 No Sheriff's employee will use or attempt to use his official position, badge, or credentials for personal or financial gain, or to gain entrance to any event except in accordance with departmental policy.

Ex. # 9. In accordance with this policy, Charles Stein, Unit Liaison Officer between the Hamilton County Sheriff's Office and the Special Deputy Unit, stated his understanding that, while it was acceptable for an officer to accept a gratuity which was offered by a merchant, it was wrong for an officer to solicit a gratuity. *See* Stein Dep. at 110. While it is unclear whether Bowles actually solicited or accepted the gratuity, Gratsch's assertion of a possibly unethical solicitation is certainly grounded in fact.

On balance, the evidence regarding two of Gratsch's allegations is in his favor, and the facts of one allegation—check-signing—are in dispute. The Court finds that where Gratsch presented two allegations of misconduct that one of the Defendants investigated and found to be true, a rea-

sonable official could not conclude that Gratsch's speech was knowingly or recklessly false. Accordingly, the Court denies qualified immunity to Defendants on this issue.

## 2. Due Process

■ The Court cannot grant summary judgment to Defendants on the issue of qualified immunity on Gratsch's due process claim. The Court finds that there is a genuine issue of fact as to whether there was an implied contract between the parties which gave Gratsch a property interest in his special deputy commission. This is material to the Defendants' immunity claim, and the Court thus cannot make a ruling on summary judgment.

■ It is clearly established that an individual is entitled to due process before being deprived of a benefit in which he or she has a property interest. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541–42, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). To show a denial of due process in the job termination context, a plaintiff must prove that he had a property interest in continued employment, and that the constitutional minimum of due process was not provided before termination. *See id.* The Supreme Court has explained that,

[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. . . . Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or

understandings that secure certain benefits and that support claims of entitlement to those benefits.

*Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

The Court finds that Gratsch has alleged facts sufficient to state a violation of his right to procedural due process. It is undisputed that the Sheriff terminated Gratsch's special deputy commission without a hearing. Further, as the Court will discuss, Gratsch has produced enough evidence to create a genuine issue as to whether he had a property interest in his commission and was thus entitled to a hearing prior to his dismissal.

The Court now evaluates whether Defendants should have qualified immunity on this claim. In light of the law discussed above, the relevant inquiry with regard to qualified immunity is whether a reasonable official would have thought either that 1) Gratsch did not have a property interest in his position, or 2) due process was provided prior to Gratsch's termination.

Defendants do not contend that they provided Gratsch with due process prior to his termination. Rather, they argue that Gratsch did not have a property interest in his special deputy commission and that due process was thus unnecessary. The Court must therefore determine whether a reasonable official would have thought that Gratsch had a property interest in his special deputy commission.

Defendants assert that Gratsch was not an employee of the Hamilton County Sheriff's Office, but was a volunteer and thus had no property interest in his commission.[2] However, it is the nature of Gratsch's position, not the terminology

---

2. Defendants claim that when the special deputy is on private duty, the special deputy is considered to be an employee of the private employer. Defendants evidence for this claim is their own statements in their affidavits and the fact that special deputies are not paid by the county, but are paid by private merchants while they are on a detail. Defendants do

provide one affidavit from Robert Cornwell, Executive Director for the Buckeye State Sheriff's Association, which says that of the 50 or 60 counties with which he is familiar, most special deputies work as "independent contractors" when working paid details. Cornwell's definition of "independent contractor" is unclear.

which is applied to his position, which is dispositive of whether a property interest existed. The Supreme Court has explained that " 'property' interests subject to a procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.' " *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) (citations omitted). The Supreme Court clarified that "a person's interest in a benefit is a property interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit." *Id.*

Thus, it should have been clear to a reasonable official at the time Gratsch was terminated that a property interest could be created by state law or mutual understandings between the parties. Therefore, the Court looks to 1) Ohio law, and 2) the evidence presented by the parties regarding their understandings about the employment relationship between the Sheriff's Department and Gratsch to determine whether it would have been clear to a reasonable official that Gratsch had a property interest in his special deputy commission.

### a. Ohio Law

There is no clearly established Ohio law that a special deputy has a property interest in his commission. In Ohio, there is a presumption that employment is at-will unless another arrangement is specified. *See Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 103, 483 N.E.2d 150 (1985). As a general rule, either party to an oral employment-at-will agreement may terminate the employment relationship for any reason not contrary to law. *See id.*

The Court finds that no state statute grants special deputies a property

right in their commission. In Ohio, a public employee "is afforded the shield of the Civil Service System and its statutory removal safeguards only if he is a 'classified' employee." *Marks v. Howe*, 1991 WL 147424 at *1 (Ohio App.Ct. Aug. 2, 1991). R.C. § 124 et. seq. Unclassified public employees have no property interest in continued employment and are thus not statutorily entitled to due process prior to termination. *See id.*

Regular deputy sheriffs generally are presumed to be classified civil servants. *See In re Termination of Employment*, 40 Ohio St.2d 107, 321 N.E.2d 603 (Ohio 1974) paragraph 2 of syllabus, (holding that deputy sheriffs are only considered to be unclassified civil servants if they are assigned to and perform duties such that they hold a fiduciary or administrative relationship to the sheriff). However, it appears that special deputies are not members of the classified civil service whatsoever. This is because special deputies are not compensated in whole or in part by state funds, and thus are not considered to be "in the service of the state" under R.C. § 124.01.[3] *See In re Ford*, 3 Ohio App.3d 416, 446 N.E.2d 214 (1982) paragraph 2 of syllabus.

Gratsch points to instances where regular and special deputies are treated similarly under the law to imply that special deputies should receive civil service protection as do regular deputies. He notes that the Sheriff appoints both regular and special deputies under R.C. § 311.04, and cites an Ohio Attorney General Opinion which clarifies that a special deputy sheriff is a 'deputy' as that term is used in R.C. § 311.04 and R.C. § 325.17. *See 1977 Ohio Op.Atty.Gen. 77–027* (clarifying that a special deputy is a deputy under the law and may therefore be compensated from the same fund as regular deputies.). However, neither of these sources establishes that a special deputy has a property inter-

---

**3.** The information provided to the Court by the parties shows that special deputies in Hamilton County are not compensated by Hamilton County, but by the private merchants for whom they serve private details. The Court has no information about how special deputies in other counties are compensated and expresses no opinion as to their status.

est in his commission, as does a regular deputy sheriff.

Looking to other Ohio statutes, Gratsch points to R.C. § 2744.01(B), which defines a political subdivision employee as "an officer, agent, employee, or servant, whether or not compensated or full-time or part-time, who is authorized to act and is acting within the scope of the officer's, agent's, employee's, or servant's employment for a political subdivision." Gratsch states that because he was an agent of the sheriff, he was an employee. However, this statute is found in R.C. Chapter 2744 titled Political Subdivision Tort Liability, and does not appear to be designed to provide a general definition of public employment. Because the Sheriff could be held liable for the torts of his agents, including volunteers, the inclusion of agents under the heading of employee does not clearly establish that such agents are considered employees for other purposes. Further, even if this statute did establish that special deputies should be considered "employees," it says nothing about whether such employment would be protected by procedural safeguards.[4]

The law in this area is unclear. Thus, for purposes of a qualified immunity analysis, these sources would not make clear to a reasonable official that a special deputy had a property interest in his commission.

### b. Mutual understandings between the parties.

The Court must now look to the mutual understandings between the parties to determine if a reasonable official would have known whether a property interest had been established. Gratsch has not produced a written contract in which the parties explicitly agreed to a relationship other than employment at will. Instead, Gratsch contends that a Sheriff's Department Manual, Ex. # 48, and the course of dealing between the parties created an implied contract that special deputies were entitled to a hearing prior to termination.

The Supreme Court of Ohio has recognized that an implied contract between an employer and employee could create an exception to the employment-at-will doctrine, allowing jury consideration of factors which may give rise to additional obligations. *Mers,* 19 Ohio St.3d at 103–104, 483 N.E.2d 150. The Court stated that,

> [t]he facts and circumstances surrounding an oral employment-at-will agreement, including the character of the employment, custom, the course of dealing between the parties, company policy, or any other fact which may illuminate the question, can be considered by the trier of fact in order to determine the agreement's explicit and implicit terms concerning discharge.

*Id.* at paragraph two of the syllabus.

Gratsch offers the following evidence to support his position that there is a mutual understanding between the Sheriff's Department and special deputies that special deputies are entitled to a hearing before termination. First, he points to the Hamilton County Sheriff's Office "Rules, Regulations, and Disciplinary Process" Manual, adopted January 1, 1987 and Reprinted with updated supplements on April 19, 1989. Ex. # 48. The Manual states as follows:

3.23 b. Upon recommended disciplinary action of suspension, termination or reduction in pay or position, the Sheriff will refer the matter to a Neutral Administrator, selected by the Sheriff, for conducting a Pre–Disciplinary Hearing. The Neutral Administrator will not be from within the employee's Chain–of–Command.

3.24 In matters referred to a Neutral Administrator, a Pre–Disciplinary Hearing will be conducted under

---

4. For the same reason, Gratsch is also unpersuasive when he argues that Defendants must be estopped from claiming that Gratsch was not an employee if they assert that special deputies Bowles and Corry have immunity as employees under *R.C. § 2744.03(A)(6).*

the procedures established for such hearings and any prevailing labor contract representing employee, with the Neutral Administrator submitting a report of the hearing to the Sheriff at which time the Sheriff will determine what action is to be taken to dispose of the disciplinary request.

## NEUTRAL ADMINISTRATOR/PRE-DISCIPLINARY HEARING

3.25 In matters requiring a Pre-Disciplinary Hearing, the Sheriff will select a supervisory officer from a division other than of the employee's direct Chain-of-Command, and will notify the Charged Employee and the Charging Supervisor by appropriate memorandum.

The function of this Hearing by a Neutral Administrator is of an interoffice review, with findings being forwarded to the Sheriff for consideration and final disposition.

Upon notification of being designated as a Neutral Administrator, such designated supervisor will proceed with notification, conducting and reporting of Pre-Disciplinary Hearing as follows or as agreed to in any prevailing labor contract covering such employee.

3.26 Written notification of the scheduled hearing will be sent to the Charged Employee. The notification will be given at least forty-eight hours prior to Hearing and shall contain:

a. Date, time and location of Hearing.

b. Identification of charges being brought against employee.

c. Notification of employee's right to have a representative of the employee's choice present at a Hearing to serve in observational and advisory role or in capacity indicated by any prevailing labor contract.

1. Representative may be legal counsel.

2. Representative may not be involved in matter before Neutral Administrator and is appearing voluntarily.

d. Notification of employee's right to question and cross-examine witnesses.

e. Notification of employee's right to have witnesses offer testimony on behalf of the employee and of requirement to submit a written list of such witnesses not later than eight hours prior to Hearing.

f. Statement notifying employee, absent any extenuating circumstances, failure to appear at the Hearing will result in a "Waiver" of the employee's right to a Hearing and may result in further action.

g. Statement advising Neutral Administrator retains right to limit the witnesses' testimony to matters relevant to proposed disciplinary action incident and to limit redundancy of testimony.

h. Notification employee may voluntarily "Waive" their right to the Pre-Disciplinary Hearing by completing the designated "Waiver" form at the bottom of notification letter.

I. Attached thereto a copy of the "Memorandum to Personnel File" form containing specifications and particulars of charges filed against the employee.

Ex. # 48.

There is a disagreement between the parties about whether Exhibit # 48 applies to special deputies. Defendants state that Exhibit # 48 does not apply to special deputies because they are not employees of the Hamilton County Sheriff. They state that special deputies are regulated by Procedure Memorandum # 20, titled Hamilton County Sheriff's Department Operating Procedure Manual, Subject: Special Deputy Assignment Procedure. Ex. # 2. This memo was issued on July

25, 1975 and revised April 1, 1988. Exhibit # 2 does not mention a hearing procedure. In relevant part, Exhibit # 2 states:

J. SUSPENSION OR REVOCATION OF SPECIAL DEPUTY COMMISSION

1. Revocation or permanent suspension of Special Deputy Commission shall be at the sole discretion of the Sheriff.

2 Temporary suspension may be made by any officer of the Sheriff's Patrol, or Special Deputy Unit Captain, where he deems it immediately necessary to withdraw the commission.

K. ASSIGNMENT AND AUTHORITY

1. The commission issued to uniformed Special Deputies assigned to the Sheriff's Patrol Division, is a restrictive commission, as provided for by Section 311.04 of the Ohio Revised Code, relative to the Sheriff's authority to appoint deputies and Special Deputies. Commissions issued to Special Deputies are specifically dealt with in the Ohio Attorney General's Opinion, 65–177, relative to the Section 311.04, and states the Sheriff can reduce the powers, rights, and duties of Special Deputies.

2. The Sheriff of Hamilton County maintains a uniformed Special Deputy Auxiliary Force within the scope of Section 311.04 of the Code, and has set forth the procedure whereby their powers, rights, and authority are in effect only upon assignment to a specific detail or duty by the Sheriff. By virtue of this operating procedure it is apparent that unless a Special Deputy is assigned to duty by the Sheriff, there is no right, power or authority to function as a Deputy Sheriff. By virtue of this same procedure all rights, powers, and authority terminates [sic] upon completion or removal from specific detail or assignment.

. . . . .

5. ... Special Deputies shall be governed by the same rules, regulations and procedures as regular deputies, where applicable.

 It is important to note that, under Ohio law, a department handbook or manual is not dispositive of the agreement between an employer or an employee. "Items such as employee handbooks, company policy or oral representations ... will not serve to alter the terms for discharge from the general at-will situation of discharge for any reason unless the parties have a 'meeting of the minds' that said items are to be considered valid contracts altering the terms for discharge." *Brandenburger v. Hilti*, 52 Ohio App.3d 21, 24, 556 N.E.2d 212 (1989). Thus, an employee "handbook may be found to alter the terms of employment at will only if the employee and employer have agreed to create a contract from the writing." *Tohline v. Central Trust Co., N.A.*, 48 Ohio App.3d 280, 282, 549 N.E.2d 1223 (1988). In the absence of mutual assent, a handbook is merely a unilateral statement of rules and policies which creates no rights or obligations. *See id.*

Gratsch attempts to marshal evidence that there was a meeting of the minds with regard to a special deputy's right to a hearing before termination. In support of this contention, Gratsch highlights the following evidence. First, Captain John Bowles and Deanna Rauen, both special deputies, received hearings before being disciplined. Ex. # 56 and # 33. Further, Captain Bowles indicated in his deposition that he viewed hearings for special deputies as customary. Also, Charles Stein indicated that it was customary for special deputies to receive hearings before being disciplined. Sean Donovan, Chief Deputy Sheriff, stated in a deposition that Exhibit # 48 applied to special deputies. Finally, Gratsch points to the language in Exhibit

#2 Section K.5 which states that special deputies and regular deputies are subject to the same rules, regulations, and procedures where applicable. Thus, he argues that the language of Exhibit #2 makes Exhibit #48 applicable to both regular and special deputies.

On the other hand, Defendants claim that, in practice, the Sheriff treated special deputies as at-will volunteers and did not provide them with neutral hearings when they were disciplined, despite the procedure outlined in Exhibit #48. Defendants further claim that there is no evidence that the Sheriff's Department and Gratsch assented to any relationship other than at-will employment. Finally, Defendants state that even if Gratsch had an implied contract, he breached it when he constructively abandoned his position by not performing his "ride time" between April and October 1995.

The Defendants' evidence for these assertions is weak. Gratsch produces depositions in which Defendant Bowles and Charles Stein seem to indicate that hearings were customary and evidence that hearings were held before disciplining special deputies. The Defendants merely produce self-serving affidavits which state the opposite.

The Court finds that Gratsch has produced evidence which creates a genuine issue of material fact as to whether there was an understanding between the Sheriff's Department and special deputies that special deputies were entitled to a hearing prior to termination.

The Defendants argue in the alternative that even if an implied contract existed, Gratsch breached it when he constructively abandoned his position. As the Court has previously discussed *supra*, there is a genuine issue for trial as to this issue.

### B. Individual Liability

 Defendants claim that Rabold, Bowles, and Corry should not be liable for any possible violation of Gratsch's rights because they did not directly terminate Gratsch's commission. In order to be liable for a violation of § 1983, an individual must encourage or somehow participate in the alleged misconduct. *See Shehee v. Luttrell,* 199 F.3d 295, 300 (6th Cir.1999).

 In this case, Defendant Rabold recommended Gratsch's termination. Defendant Bowles signed and concurred in the recommendation. Prior to Gratsch's termination, Defendant Corry recommended that Gratsch be disciplined for insubordination. The parties dispute whether this discipline was due to Gratsch's request for a hearing, or because Gratsch was insubordinate when he left a unit meeting.

 It is clear that Rabold and Bowles directly participated in Gratsch's termination. There is at least a genuine issue of fact for the jury as to whether Corry encouraged or participated in the termination. Thus, the Court will not dismiss any of the individual Defendants from this matter on summary judgment.

### C. Gratsch's Substantive Claims

Having made these determinations, the Court must consider the Defendants' Motion for Summary Judgment on Gratsch's substantive claims. In doing so, the Court finds that it cannot grant summary judgment on any of Gratsch's claims.

### 1. First Amendment Retaliation

Gratsch states that he was fired as a result of his charges of fraud and misconduct in the Eastern Unit. He argues that his termination violated his right to be free from retaliation for engaging in speech which is protected by the First Amendment. Defendants move for summary judgment on this claim, arguing that Gratsch's speech was unprotected because he knew his charges to be false. For the reasons stated *supra*, the Court denies Defendants' Motion for Summary Judgment on this issue.

### 2. Procedural Due Process

Gratsch argues that Defendants violated his right to procedural and substantive due process when he was terminated without a hearing. Defendants contend that Gratsch was not entitled to a hearing prior to termination because he was a volunteer who served at the pleasure of the Sheriff and had no property interest in his commission. Further, Defendants assert that, even if the Court were to determine that Gratsch was entitled to a hearing, Gratsch constructively abandoned his position. The Court finds that Gratsch has produced enough evidence to create genuine issues of material fact, including those discussed *supra*, with regard to his Due Process claim. The Court thus denies Defendants' Motion for Summary Judgment on this issue.

### 3. Substantive Due Process

■ Gratsch alleges in Count Two of his Complaint that Defendants violated his right to substantive due process. Neither of the parties briefed this claim in their pleadings. However, the Court dismisses Gratsch's substantive due process claim *sua sponte.*

■ When an explicit constitutional right is available as a source of protection, a court should use it instead of the open-ended right to substantive due process. *See Thaddeus–X v. Blatter,* 175 F.3d 378, 387 (6th Cir.1999). "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

Here, Gratsch finds explicit protection in the First Amendment's guarantee of free speech and the Fourteenth Amendment's guarantee of procedural due process. These Amendments are sufficient to protect Gratsch's rights, and the Court will not look unnecessarily to substantive due process.

### 4. State Law Claims

Gratsch alleges that Defendants' actions violate his right to due process under Ohio common law and constitute tortious interference with a business relationship, breach of contract, and wrongful termination in violation of public policy. The Court finds that there are genuine issues of material fact with regard to Gratsch's state law claims. The Court thus denies Defendant's Motion for Summary Judgment on this issue.

### D. Eastern Unit's Motion for Summary Judgment

■ The Court grants the Eastern Unit's Motion for Summary Judgment because the Eastern Unit did not play a role in Gratsch's termination.

In order to be liable for a violation of 42 U.S.C. § 1983, a person must "subject[ ] or cause[ ] to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws. . . ." 42 U.S.C. § 1983. The Eastern Unit is not liable for any of Gratsch's § 1983 claims because it did not subject or cause Gratsch to be subjected to his termination.

■ In this case, each of Gratsch's § 1983 claims stem from his termination. He asserts that his termination violated the First Amendment because it was in retaliation for his protected speech and violated the Fourteenth Amendment because it was not preceded by a hearing. However, the Eastern Unit played no role in Gratsch's termination. The Sheriff possessed the sole authority to hire and fire Gratsch. *See State ex rel. Geyer v. Griffin,* 80 Ohio App. 447, 458, 76 N.E.2d 294 (1947) ("A sheriff is vested with absolute discretion to determine what deputies shall be employed, the length or their employment, and the duties of his office to be performed by them. . . ."). It is undisput-

ed that the Eastern Unit is a non-profit corporation which consists of special deputies appointed by the Sheriff. pursuant to O.R.C. § 311.04. The Eastern Unit claims, and Gratsch does not dispute, that it did not have any contract, agreement or understanding with Gratsch that he was employed by the Eastern Unit. Rather, the Eastern Unit contends that it maintained a relationship with third party private employers to facilitate the disbursement of funds between them and the special deputies. Gratsch does not contest this point. The entity of the Eastern Unit did nothing to "subject or cause [Gratsch] to be subjected," 42 U.S.C. § 1983, to his termination. Further, as there is no respondeat superior liability in § 1983 cases, *see Board of County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997), the involvement of Bowles and Corry does not implicate the Eastern Unit even if the Court were to determine that the Eastern Unit was the employer of the special deputies assigned to the unit.

The Eastern Unit also contends that it should not be liable for Gratsch's § 1983 claims because it is not a state actor. The Court finds it unnecessary to rule on this issue since it has dismissed Gratsch's § 1983 claims against the Eastern Unit on other grounds.

■ As to Gratsch's state law claims, Gratsch argues that if special deputies Bowles or Corry are found liable for tortious interference with a business relationship or termination in violation of public policy, the Eastern Unit is liable for their conduct if it was done in the scope of their employment.

Gratsch advances two arguments in support of his claim that the Eastern Unit is the special deputies' employer. First, he contends that the Hamilton County Sheriff is his employer. However, he argues in the alternative that if the Court determines that the Sheriff is not the special deputies' employer, then the Eastern Unit is. Second, Gratsch claims that the East-

ern Unit is considered the special deputies' employer for purposes of worker's compensation and produces evidence that the Eastern Unit does indeed pay the special deputies' worker's compensation. *See* O.R.C. § 4123.01. This is the only substantive argument offered by Gratsch on this point.

■ Assuming arguendo that the Eastern Unit pays worker's compensation for the special deputies, this is not sufficient to prove that the Eastern Unit is the special deputies' employer and is thus liable for their behavior. When determining whether an employment relationship exists, direction and control of the work being done usually are determinative. *See Stevenson v. Lake Terminal R. Co.*, 42 F.2d 357, 359 (6th Cir.1930). Selection and engagement, payment of wages, and the power of dismissal are also relevant. *See id.*

Applying these guidelines to the relationship between the Eastern Unit and the special deputies within the Unit, the Court finds that an employment relationship did not exist. The Eastern Unit did not control or direct the work being done by the special deputies. Rather, the special deputies were subject to the rules and regulations of the Hamilton County Sheriff's Office. *See* Ex. # 2. Also relevant, the Eastern Unit did not select, hire, pay, or have the power to terminate the special deputies in the unit. Sheriff Leis retained the power to hire and fire the special deputies. *See State ex rel. Geyer v. Griffin*, 80 Ohio App. 447, 458, 76 N.E.2d 294 (1947). Finally, it is undisputed that the special deputies were paid by the private entities for which they served details.

Because the Eastern Unit is not Bowles' and Corry's employer, it cannot be held vicariously liable for their actions. The doctrine of respondeat superior does not apply if an employment relationship does not exist. *See Lamb v. Interstate S.S. Co.*, 149 F.2d 914, 917 (6th Cir.1945). Thus,

since Gratsch has identified only the actions of Captain Bowles and Lieutenant Corry as the source of liability for the Eastern Unit, the Eastern Unit is not liable for any of Gratsch's state claims.

### E. Gratsch's Motion for Judicial Estoppel

■ Gratsch moves to prevent Defendants from arguing that he is an employee of the private merchants for whom he works private details because Hamilton County prosecuted a deputy for "theft in office" while working a detail at Dillard's department store. *See State of Ohio v. Cronin,* B–9903464 (Hamilton County Court of Common Pleas, August 3, 1999). This case is not on point. As the Court discussed *supra,* the issue of who employs an individual is determined by who controls the means and manner of the individual's work. Arguing that a deputy used his "office" to commit a theft while working a private detail does not necessarily take a position as to the deputy's employment status. Further, the arguments of the county are not made clear in the transcript. The Court is unwilling to prevent a party from making an argument unless it is clear that they have argued an inconsistent position in another forum. This is not clear from the transcript of the case cited by Gratsch. Thus, the Court denies Gratsch's Motion for Judicial Estoppel.

The Court notes, however, that its denial of Gratsch's Motion does not harm his case. Gratsch argued that if the Court granted his motion, it would prove that he was an employee who was deserving of a hearing, and that his speech was of public concern because Eastern Unit funds would be considered public money. However, even if Gratsch were termed an "employee," this does not prove that he is not at-will, or that he had a property interest in his commission. Further, the Court has already determined that Gratsch's speech was of public concern. Thus, the denial of this Motion has no effect on his case.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment (doc. 25) is **DENIED,** the Eastern Unit's Motion for Summary Judgment (doc. 27) is **GRANTED,** Plaintiff's Motion for Judicial Estoppel (doc. 44) is **DENIED,** and Plaintiff's substantive due process claim (Count Two) is **DISMISSED.**

**IT IS SO ORDERED.**