## O'HARE TRUCK SERVICE, INC., ET AL. *v.* CITY OF NORTHLAKE ET AL.

No. 95–191.   Argued March 20, 1996—Decided June 28, 1996

714

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined. SCALIA, J., filed a dissenting opinion, in which THOMAS, J., joined, *ante*, p. 686.

*Harvey Grossman* argued the cause for petitioners. With him on the briefs were *Jane M. Whicher, Barbara P. O'Toole, Steven R. Shapiro, Michael P. McGovern, Colleen K. Connell,* and *Marc O. Beem.*

*Gary M. Feiereisel* argued the cause for respondents. With him on the brief was *Frank P. Kasbohm.**

JUSTICE KENNEDY delivered the opinion of the Court.

Government officials may not discharge public employees for refusing to support a political party or its candidates, unless political affiliation is a reasonably appropriate requirement for the job in question. *Elrod* v. *Burns,* 427 U. S. 347 (1976); *Branti* v. *Finkel,* 445 U. S. 507 (1980). We must decide whether the protections of *Elrod* and *Branti* extend to an independent contractor, who, in retaliation for refusing to comply with demands for political support, has a government contract terminated or is removed from an official list of contractors authorized to perform public services. Although the government has broad discretion in formulating its contracting policies, we hold that the protections of *Elrod* and

---

*Robert A. Hirsch* filed a brief for the Towing & Recovery Association of America, Inc., as *amicus curiae* urging reversal.

*Jeffrey D. Colman, Edward J. Lewis II,* and *David Jiménez-Ekman* filed a brief for Illinois State Officials as *amicus curiae* urging affirmance.

*Branti* extend to an instance like the one before us, where government retaliates against a contractor, or a regular provider of services, for the exercise of rights of political association or the expression of political allegiance.

## I

The suit having been dismissed by the District Court for failure to state a claim, the complaint's factual allegations are taken as true. *Leatherman* v. *Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U. S. 163, 164 (1993). John Gratzianna is the owner and operator of O'Hare Truck Service, which provides towing services in Cook and DuPage Counties, Illinois. Gratzianna and his company are petitioners here, and we sometimes refer to them as O'Hare.

The city of Northlake, a respondent in this Court, coordinates towing services through its Police Department and for at least 30 years has maintained a rotation list of available towing companies. When the police receive a tow request, they call the company next on the list to provide the service. Until the events recounted here, the city's policy had been to remove a tow truck operator from the rotation list only for cause. O'Hare had been on the list since 1965, performing towing services at the city's request. O'Hare and the city's former Mayor, Gene Doyle, had a mutual understanding that the city would maintain O'Hare's place on the rotation list so long as O'Hare provided good service. In 1989, soon after being elected Northlake's new Mayor, respondent Reid Paxson told Gratzianna he was pleased with O'Hare's work and would continue using and referring its services.

Four years later, when Paxson ran for reelection, his campaign committee asked Gratzianna for a contribution, which Gratzianna refused to make. Gratzianna instead supported the campaign of Paxson's opponent and displayed the opponent's campaign posters at O'Hare's place of business. Soon after, O'Hare was removed from the rotation list. We shall

assume, as the complaint alleges, that the removal was in retaliation for Gratzianna's stance in the campaign. Petitioners allege the retaliation caused them to lose substantial income.

O'Hare and Gratzianna sued in the United States District Court for the Northern District of Illinois, alleging infringement of First Amendment rights in violation of Rev. Stat. § 1979, 42 U. S. C. § 1983. In conformity with binding Seventh Circuit precedent, which does not extend *Elrod* and *Branti* to independent contractors, see, *e. g., Downtown Auto Parks, Inc.* v. *Milwaukee,* 938 F. 2d 705, cert. denied, 502 U. S. 1005 (1991), the District Court dismissed the complaint, 843 F. Supp. 1231 (1994). The Court of Appeals for the Seventh Circuit affirmed, adhering to the view that "it should be up to the Supreme Court to extend *Elrod.*" 47 F. 3d 883, 885 (1995). (The Court of Appeals also affirmed dismissal of O'Hare's claim that respondents' failure to give it notice of removal from the list or provide a hearing on the matter deprived O'Hare of due process of law. That ruling is not before us.)

The Courts of Appeals take different positions concerning *Elrod* and *Branti*'s applicability to independent contractors. Compare 47 F. 3d 883 (1995) (opinion below); *Horn* v. *Kean,* 796 F. 2d 668 (CA3 1986) (en banc); *Sweeney* v. *Bond,* 669 F. 2d 542 (CA8), cert. denied *sub nom. Schenberg* v. *Bond,* 459 U. S. 878 (1982), with *Blackburn* v. *Marshall,* 42 F. 3d 925 (CA5 1995); *Abercrombie* v. *Catoosa,* 896 F. 2d 1228 (CA10 1990). We granted certiorari to resolve the conflict, 516 U. S. 1020, and now reverse.

## II

The Court has rejected for decades now the proposition that a public employee has no right to a government job and so cannot complain that termination violates First Amendment rights, a doctrine once captured in Justice Holmes' aphorism that although a policeman "may have a constitutional right to talk politics . . . he has no constitutional right to be

a policeman," *McAuliffe* v. *Mayor of New Bedford*, 155 Mass. 216, 220, 29 N. E. 517 (1892). A State may not condition public employment on an employee's exercise of his or her First Amendment rights. See, *e. g.*, *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589 (1967); *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563 (1968); *Perry* v. *Sindermann*, 408 U. S. 593 (1972). See also *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr, ante*, at 674–675 (collecting cases). As we have said: "[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' Such interference with constitutional rights is impermissible." *Perry* v. *Sindermann, supra*, at 597, quoting *Speiser* v. *Randall*, 357 U. S. 513, 526 (1958). Absent some reasonably appropriate requirement, government may not make public employment subject to the express condition of political beliefs or prescribed expression.

In *Elrod* v. *Burns*, 427 U. S. 347 (1976), we considered whether to apply the principles of the unconstitutional conditions cases to public employees dismissed on account of their political association. In keeping with local tradition, a newly elected county sheriff had discharged non-civil-service employees because they were not members of his political party. It was by no means self-evident whether our First Amendment precedents applied, for as Justice Powell explained in dissent, *id.*, at 377–387, the patronage practices at issue had been sanctioned by history and had been thought by some to contribute to the effective operation of political parties. See also *Branti* v. *Finkel*, 445 U. S., at 522, n. 1, 527–532 (Powell, J., dissenting); *Rutan* v. *Republican Party of Ill.*, 497 U. S. 62, 104–109 (1990) (SCALIA, J., dissenting). If indeed those patronage practices fortify the party system, they may serve important First Amendment interests, since

parties promote and generate political discourse, see, *e. g.*, *Buckley* v. *Valeo*, 424 U. S. 1, 14–15 (1976) *(per curiam); Democratic Party of United States* v. *Wisconsin ex rel. La Follette*, 450 U. S. 107, 121–122 (1981).

We need not inquire, however, whether patronage promotes the party system or serves instead to entrench parties in power, see *Elrod* v. *Burns, supra,* at 364–373 (plurality opinion); *Rutan* v. *Republican Party of Ill., supra,* at 88–89, n. 4 (STEVENS, J., concurring), for *Elrod* and *Branti* establish that patronage does not justify the coercion of a person's political beliefs and associations. Although no opinion in *Elrod* commanded a majority of the Court, five Justices found common ground in the proposition that subjecting a nonconfidential, nonpolicymaking public employee to penalty for exercising rights of political association was tantamount to an unconstitutional condition under *Perry* v. *Sindermann, supra.* See *Elrod* v. *Burns, supra,* at 359 (plurality opinion) ("The threat of dismissal for failure to provide [support for the favored political party] unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise"); 427 U. S., at 375 (Stewart, J., concurring in judgment) ("The single substantive question involved in this case is whether a nonpolicymaking, nonconfidential government employee can be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs. I agree with the plurality that he cannot").

Four Terms later, in *Branti* v. *Finkel, supra,* we reaffirmed *Elrod*'s common holding and said government termination of a public employee on account of his political affiliation brings our unconstitutional conditions cases into play, for "[i]f the First Amendment protects a public employee from discharge based on what he has said, it must also protect him from discharge based on what he believes," 445 U. S., at 515. We also modified the standard, announced in the two opinions supporting the *Elrod* judgment, for assess-

ing when party affiliation, consistent with the First Amendment, may be an acceptable basis for terminating a public employee: "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." 445 U. S., at 518.

Our cases call for a different, though related, inquiry where a government employer takes adverse action on account of an employee or service provider's right of free speech. There, we apply the balancing test from *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty., supra.* See generally *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr, ante,* at 675–678. *Elrod* and *Branti* involved instances where the raw test of political affiliation sufficed to show a constitutional violation, without the necessity of an inquiry more detailed than asking whether the requirement was appropriate for the employment in question. There is an advantage in so confining the inquiry where political affiliation alone is concerned, for one's beliefs and allegiances ought not to be subject to probing or testing by the government. It is true, on the other hand, as we stated at the outset of our opinion, *supra,* at 714, that the inquiry is whether the affiliation requirement is a reasonable one, so it is inevitable that some case-by-case adjudication will be required even where political affiliation is the test the government has imposed. A reasonableness analysis will also accommodate those many cases, perhaps including the one before us, where specific instances of the employee's speech or expression, which require balancing in the *Pickering* context, are intermixed with a political affiliation requirement. In those cases, the balancing *Pickering* mandates will be inevitable. This case-by-case process will allow the courts to consider the necessity of according to the government the discretion it requires in the administration

and awarding of contracts over the whole range of public works and the delivery of governmental services.

The Court of Appeals, based on its understanding of the pleadings, considered this simply an affiliation case, and held, based on Circuit precedent, there was no constitutional protection for one who was simply an outside contractor. We consider the case in those same terms, but we disagree with the Court of Appeals' conclusion.

## III

There is no doubt that if Gratzianna had been a public employee whose job was to perform tow truck operations, the city could not have discharged him for refusing to contribute to Paxson's campaign or for supporting his opponent. In *Branti*, we considered it settled that to fire a public employee as a penalty for refusing a request for political and financial support would impose an unconstitutional condition on government employment. See 445 U. S., at 516. Respondents insist the principles of *Elrod* and *Branti* have no force here, arguing that an independent contractor's First Amendment rights, unlike a public employee's, must yield to the government's asserted countervailing interest in sustaining a patronage system. We cannot accept the proposition, however, that those who perform the government's work outside the formal employment relationship are subject to what we conclude is the direct and specific abridgment of First Amendment rights described in this complaint. As respondents offer no justification for their actions, save for insisting on their right to condition a continuing relationship on political fealty, we hold that the complaint states an actionable First Amendment claim.

The complaint alleges imposition of a burden on an individual's right of political association, a concerted effort to coerce its relinquishment. O'Hare was not part of a constituency that must take its chance of being favored or ignored in the larger political process—for example, by residing or doing

business in a region the government rewards or spurns in the construction of public works. Gratzianna instead was targeted with a specific demand for political support. When Gratzianna refused, the city terminated a relationship that, based on longstanding practice, he had reason to believe would continue. We see nothing to distinguish this from the coercion exercised in our other unconstitutional conditions cases. See, *e. g.*, *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589 (1967) (teaching position conditioned upon nonmembership in "subversive" organizations); *Perry* v. *Sindermann*, 408 U. S. 593 (1972) (teaching position conditioned upon not criticizing college administration). Had Paxson or his backers solicited the contribution as a *quid pro quo* for not terminating O'Hare's arrangement with the city, they might well have violated criminal bribery statutes. Cf. Ill. Comp. Stat., ch. 720, §§ 5/33–1, 5/33–3; ch. 65, § 5/4–8–2 (1994). That Paxson may have steered clear of criminal liability, however, does little to diminish the attempted coercion of Gratzianna's political association, enforced by a tangible punishment. Our cases make clear that the government may not coerce support in this manner, unless it has some justification beyond dislike of the individual's political association. See, *e. g.*, *Branti* v. *Finkel*, 445 U. S., at 516–517.

Respondents say this case is different because it involves a claim by an independent contractor. We are not persuaded. A rigid rule "giv[ing] the government *carte blanche* to terminate independent contractors for exercising First Amendment rights . . . would leave [those] rights unduly dependent on whether state law labels a government service provider's contract as a contract of employment or a contract for services, a distinction which is at best a very poor proxy for the interests at stake." *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr, ante,* at 679. It is true that the distinction between employees and independent contractors has deep roots in our legal tradition, see, *e. g.,* 9 W. Jaeger,

Williston on Contracts § 1012A (3d ed. 1967); 1 Restatement of Agency §§ 2, 220 (1933), and often serves as a line of demarcation for differential treatment of individuals who otherwise may be situated in similar positions, see, *e. g.,* *Community for Creative Non-Violence* v. *Reid,* 490 U. S. 730 (1989); *Nationwide Mut. Ins. Co.* v. *Darden,* 503 U. S. 318 (1992); 2 Restatement (Second) of Torts § 409 (1964). We see no reason, however, why the constitutional claim here should turn on the distinction, which is, in the main, a creature of the common law of agency and torts. Recognizing the distinction in these circumstances would invite manipulation by government, which could avoid constitutional liability simply by attaching different labels to particular jobs, *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr, ante,* at 679. The fact of interference here is not altered by the circumstance that the victims are not classified as employees.

Our conclusion is in accord with *Lefkowitz* v. *Turley,* 414 U. S. 70 (1973), where independent contractor status did not suffice to allow government to insist upon a waiver of the Fifth Amendment's privilege against self-incrimination. After reviewing our rulings extending the Fifth Amendment's privilege to government employees, we said that "[w]e fail to see a difference of constitutional magnitude between the threat of job loss to an employee of the State, and a threat of loss of contracts to a contractor." *Id.,* at 83.

Some Courts of Appeals, refusing to extend *Elrod* and *Branti* to independent contractors, find "a difference of constitutional magnitude" in the relative degree to which employees and contractors depend on government sources for their income. See *LaFalce* v. *Houston,* 712 F. 2d 292, 294 (CA7 1983) ("An independent contractor would tend we imagine to feel a somewhat lesser sense of dependency"), cert. denied, 464 U. S. 1044 (1984); *Horn* v. *Kean,* 796 F. 2d, at 675 (same). Respondents present no convincing data to support this speculation, however, and we doubt it is true for many service providers who come under the formal clas-

sification of "independent contractor," cf., *e. g., Havekost* v. *United States Dept. of Navy,* 925 F. 2d 316 (CA9 1991) (worker was licensed grocery bagger at Navy commissary). The only statistics presented to us in the briefs are relevant to tow truck services, and these data point the other way. A national association of towing and recovery service operators, appearing as *amicus,* estimates that 75 percent of towing companies provide services in connection with government requests, the referrals generating between 30 and 60 percent of their gross revenues. Brief for Towing & Recovery Assn. of America, Inc., as *Amicus Curiae* 9. Petitioners, furthermore, allege a loss of substantial income due to their termination.

Perhaps some contractors are so independent from government support that the threat of losing business would be ineffective to coerce them to abandon political activities. The same might be true of certain public employees, however; they, too, might find work elsewhere if they lose their government jobs. If results were to turn on these sorts of distinctions, courts would have to inquire into the extent to which the government dominates various job markets as employer or as contractor. We have been, and we remain, unwilling to send courts down that path. See, *e. g., Perry* v. *Sindermann, supra,* at 597–598. Courts are not well suited to the task of measuring levels of employee dependence, but there is a more fundamental concern. Independent contractors, as well as public employees, are entitled to protest wrongful government interference with their rights of speech and association.

Some Courts of Appeals surmise that independent contractors doing business with the government "are political hermaphrodites," *LaFalce* v. *Houston, supra,* at 294, who find it in their self-interest to stay on good terms with both major political parties and so are not at great risk of retaliation for political association. The facts here, if the allegations in the complaint are true, indicate this dubious course

of action may not be followed by many small independent contractors who are either unable or unwilling to maintain close ties to all the organized political forces in their communities. In all events, even if some independent contractors adjust to their precarious position by currying favor with diverse political parties, the question here concerns coercive government action taken against those who do not. That some citizens find a way to mitigate governmental overreaching, or refrain from complaining, does not excuse wrongs done to those who exercise their rights.

Respondents argue that any decision in O'Hare's favor will lead to numerous lawsuits, which will interfere with the sound administration of government contracting. We have little reason to accept the assessment. The *amicus* brief filed on behalf of respondents' position represents that in the six years since our opinion in *Rutan* v. *Republican Party of Ill.*, 497 U. S. 62 (1990), which extended *Elrod* and *Branti* to public employment promotion, transfer, recall, and hiring decisions based on political affiliation, only 18 suits alleging First Amendment violations in employment decisions have been filed against Illinois state officials, Brief for Illinois State Officials as *Amicus Curiae* 3. Furthermore, we have found no reported case in the Tenth Circuit involving a First Amendment patronage claim by an independent contractor in the six years since its Court of Appeals first recognized such claims, see *Abercrombie* v. *Catoosa*, 896 F. 2d 1228 (1990). We have no reason to believe that governments cannot bear a like burden in defending against suits alleging the denial of First Amendment freedoms to public contractors, and we doubt that our decision today will lead to the imposition of a more extensive burden.

Cities and other governmental entities make a wide range of decisions in the course of contracting for goods and services. The Constitution accords government officials a large measure of freedom as they exercise the discretion inherent

in making these decisions. *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr, ante,* at 674. Interests of economy may lead a governmental entity to retain existing contractors or terminate them in favor of new ones without the costs and complexities of competitive bidding. A government official might offer a satisfactory justification, unrelated to the suppression of speech or associational rights, for either course of action. The first may allow the government to maintain stability, reward good performance, deal with known and reliable persons, or ensure the uninterrupted supply of goods or services; the second may help to stimulate competition, encourage experimentation with new contractors, or avoid the appearance of favoritism. These are choices and policy considerations that ought to remain open to government officials when deciding to contract with some firms and not others, provided of course the asserted justifications are not the pretext for some improper practice. In view of the large number of legitimate reasons why a contracting decision might be made, fending off baseless First Amendment lawsuits should not consume scarce government resources. If the government terminates its affiliation with a service provider for reasons unrelated to political association, *Mt. Healthy City Bd. of Ed.* v. *Doyle,* 429 U. S. 274, 287 (1977), as, for example, where the provider is unreliable, or if the service provider's political "affiliation is an appropriate requirement for the effective performance" of the task in question, *Branti* v. *Finkel,* 445 U. S., at 518, there will be no First Amendment violation.

Respondents' theory, in essence, is that no justification is needed for their actions, since government officials are entitled, in the exercise of their political authority, to sever relations with an outside contractor for any reason including punishment for political opposition. Government officials may indeed terminate at-will relationships, unmodified by any legal constraints, without cause; but it does not follow

that this discretion can be exercised to impose conditions on expressing, or not expressing, specific political views, see *Perry* v. *Sindermann,* 408 U. S., at 597.

The absolute right to enforce a patronage scheme, insisted upon by respondents as a means of retaining control over independent contractors, Brief for Respondents 13, and satisfying government officials' concerns about reliability, Tr. of Oral Arg. 34–39, has not been shown to be a necessary part of a legitimate political system in all instances. This was the determination controlling our decisions in *Elrod,* 427 U. S., at 365–368, 372–373 (plurality opinion), and *Branti, supra,* at 518–520, and we see no basis for rejecting that reasoning in this context. We decline to draw a line excluding independent contractors from the First Amendment safeguards of political association afforded to employees.

## IV

Upon such further proceedings as are deemed appropriate by the Court of Appeals or the District Court, including upon motion for summary judgment if there is no genuine issue as to material facts, the courts on remand should decide whether the case is governed by the *Elrod-Branti* rule or by the *Pickering* rule.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

[For dissenting opinion of JUSTICE SCALIA, see *ante,* p. 686.]