**SAVOY OF NEWBURGH, INC., Rudolph LaMarr, Salvatore Cucorullo, and Quincy Magwood, Plaintiffs,**

v.

**CITY OF NEWBURGH, City of Newburgh Local Development Corporation, City of Newburgh Industrial Development Agency, Nicholas Valentine and Stephan Rockafellow, Defendants.**

**No. 04 Civ. 1405(WHP).**

United States District Court, S.D. New York.

Sept. 21, 2009.

Michael H. Sussman, Esq., Sussman
Law Offices, Goshen, NY, for Plaintiffs.

James M. Fedorchak, Esq, Gellert & Klein, P.C., Poughkeepsie, NY, Patrick T. Burke, Esq., Richard B. Golden, Esq., Burke, Miele & Golden, LLP, Suffern, NY, for Defendants.

## MEMORANDUM & ORDER

WILLIAM H. PAULEY, III, District Judge:

Plaintiffs Savoy of Newburgh, Inc. ("Savoy"), Rudolph LaMarr ("LaMarr"), Salvatore Cucorullo ("Cucorullo"), and Quincy Magwood ("Magwood") bring this federal civil rights action against Defendants City of Newburgh (the "City"), City of Newburgh Local Development Corporation (the "LDC"), City of Newburgh Industrial Development Agency (the "IDA"), Nicholas Valentine ("Valentine"), and Stephan Rockafellow ("Rockafellow") for violations of their First Amendment rights. Defendants move for summary judgment. For the following reasons, Defendants' motion is denied.

## BACKGROUND [1]

### I. The Parties

Savoy is a corporation that was formed in April 2001 by LaMarr, Cucorullo, and Magwood for the purpose of converting a furniture store in Newburgh, New York into a nightclub. (Plaintiffs' Responsive 56.1 Statement dated Apr. 17, 2006 ("Pls. 56.1 Stmt.") ¶ 1; Affidavit of Patrick Burke dated Aug. 6, 2009 ("Burke Aff.") at 3–4.) LaMarr is a Democratic political activist in Newburgh, who had served as an advisor to Andrew Marino's successful campaign for mayor of Newburgh in No-

vember 2000. (Pls. 56.1 Stmt. ¶¶ 2–3; Burke Aff. at 4.) Valentine and Rockafellow are Republicans and former members of the Newburgh City Council and the boards of the IDA and LDC. (Burke Aff. at 3.)

### II. The Initial Support for Savoy

Savoy sought a loan for its nightclub project from the City. (Pls. 56.1 Stmt. ¶¶ 9–12; Burke Aff. at 5.) In June 2002, the Board of Directors of the LDC (the "LDC Board") considered several proposals to provide $380,000 in financing or loan guarantees to Savoy. (Burke Aff. at 5; Pls. 56.1 Stmt. ¶¶ 11–12.) Later that month, the LDC Board approved support for Savoy's nightclub project. (Burke Aff. at 6; Pls. 56.1 Stmt. ¶ 31.) Rockafellow voted against the support and Valentine abstained. (Burke Aff. at 6; Pls. 56.1 Stmt. ¶¶ 34, 36; Burke Aff. at 5; Affidavit of Michael H. Sussman dated Aug. 16, 2009 ("Sussman Aff.") at 11.) Cucorullo testified that before the vote Valentine advised Cucorullo that he would oppose the project so long as LaMarr was associated with it. (Sussman Aff. at 9; Pls. 56.1 Stmt. ¶ 42.) After the resolution was approved, $380,000 was transferred from the IDA to Savoy. (Burke Aff. at 6–7; Pls. 56.1 Stmt. ¶¶ 50–53.) Savoy began to spend the money. (Pls. 56.1 Stmt. ¶ 53.)

### III. The Position Statement

On July 15, 2002, Rockafellow and Valentine submitted a "Position Statement" to the Newburgh City Council expressing concerns about Savoy's project and the approval process for the loan. (Burke Aff.

---

1. Defendants' Rule 56.1 Statement is inadequate. It is a word-for-word copy of the "Background" section of Judge Brieant's May 2006 Memorandum and Order without a single citation to the record. Defendants also submitted an attorney affidavit and an affida-

vit by a former employee of the IDA. While Plaintiffs submitted a responsive 56.1 Statement, Defendants offered nothing further. Thus, this Court was required to wade through the record. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 72 (2d Cir.2001).

at 8; Pls. 56.1 Stmt. ¶ 54; JA00734–736.[2]) The Position Statement also states that "[i]t again becomes evident why Mayor Marino replaced many of the experienced and conscientious IDA Board Members with personal friends of his immediately upon gaining a majority on the City Council last January." (JA00735.) Rockafellow and Valentine claimed in the Position Statement that they had a number of areas of concern including LaMarr's involvement in the Savoy project and LaMarr's involvement in a number of failed projects in Newburgh that had cost the City large amounts of money. (JA00735.) Plaintiffs dispute nearly all of the claims made about LaMarr in the Position Statement. (Pls. 56.1 Stmt. ¶¶ 55–58.) The Position Statement opines "that the vote [on the Savoy nightclub project] was rushed through because the Savoy partners (Rudy LaMarr, John Frontera) are personal friends of Lester Spellman, Mayor Marino, and the Democratic members of the City Council . . . ." (JA00735.)

## IV. *The Preliminary Agreement*

On August 9, 2002, the City demanded the return of the $380,000, claiming it had been improperly disbursed to Savoy. (Burke Aff. at 9.) On August 21, 2002, Savoy returned $250,000 but could not return the balance because it had been spent. (Pls. 56.1 Stmt. ¶ 100; Burke Aff. at 9.) Savoy then sought to have the City re-loan the money. (Pls. 56.1 Stmt. ¶ 101; Burke Aff. at 10.) On August 26, 2002, Plaintiffs signed a loan agreement with the IDA (the "August 26th Agreement"), which was approved by a 5–1 vote. (Pls. 56.1 Stmt. ¶¶ 102, 106.) The August 26th Agreement provided that, in return for receiving a loan from the IDA, Plaintiffs agreed to give mortgages on their personal residences, sign a superseding long-form loan agreement, and provide other collateral or sign other loan documents as required by the IDA. (Burke Aff. Ex. R: Loan Agreement dated Aug. 26, 2002.)

In October 2002, one of the City council members voted with Rockafellow and Valentine to replace two of the members of the IDA Board of Directors. (Pls. 56.1 Stmt. ¶ 107.) Plaintiffs contend that these two new members were political allies of Valentine and Rockafellow. (Pls. 56.1 Stmt. ¶ 107.)

In November 2002, Robert McKenna, the former IDA head returned to the position of Economic Director of the IDA, replacing Lester Spellman. (Pls. 56.1 Stmt. ¶ 109.) Around the same time, McKenna presented Plaintiffs with a long-form loan agreement to supersede the August 26th Agreement (the "November 2002 Proposal"). (Pls. 56.1 Stmt. ¶ 109.) Plaintiffs contend that this long-form agreement differed materially from the original loan agreement because it not only required a mortgage on their personal residences but also required that any other mortgages on LaMarr's, Cucorullo's, and Magwood's personal residences collectively total no more than $269,387. (Pls. 56.1 Stmt. ¶ 109.) In contrast, the August 26th Agreement only required that each Savoy principal would give the IDA "a mortgage on his personal residence which will be subordinate only to the current mortgage holder, if any, and American Credit." (Pls. 56.1 Stmt. ¶ 109.) Plaintiffs note that American Credit, Savoy's primary lender, had agreed to loan $850,000 for the nightclub project and take a subordinate position to existing home mortgages, an arrangement that was not feasible

2. "JA00XXX" refers to the Joint Appendix submitted in conjunction with the 2006 appeal.

under November 2002 Proposal. (Pls. 56.1 Stmt. ¶ 110.) The November 2002 Proposal also required that Savoy grant a mortgage lien to the IDA on the nightclub property, and that the Savoy principals provide their "unlimited personal guarantees." (Pls. 56.1 Stmt. ¶ 111.) The parties sharply dispute whether such personal guarantees or such extensive collateral were required for any other loan made by the IDA or its predecessor the Kingston–Newburgh Enterprise Corporation. Plaintiffs offer evidence that the IDA had no standard loan forms and that no guarantees were required for a number of prior loans, including loans to political allies of Valentine and Rockafellow. (Pls. 56.1 Stmt. ¶¶ 137–190; Susmann Aff. at 19–26.)

Savoy offered a series of counter-proposals to the IDA. (Pls. 56.1 Stmt. ¶¶ 112–117.) The Board held a meeting on January 16, 2003, during which McKenna and another IDA official proposed a compromise whereby Savoy and its principals would not have to grant mortgages on their homes to the IDA. (Pls. 56.1 Stmt. ¶ 128.) Before the January 16, 2003 meeting, Cucorullo claims that Valentine came up to him and said "[I]t's all politics, don't worry about it." (Pls. 56.1 Stmt. ¶ 123.) In February 2003, the IDA Board voted this proposal down by a 4–2 vote, with Valentine, Rockafellow, and the two Board members appointed in October 2002 voting together. (Pls. 56.1 Stmt. ¶ 131.) Thus, the IDA declined to relinquish its demands for greater security.

In July 2003, the IDA Board authorized the institution of a collection lawsuit in the New York State Supreme Court (Orange County) for the $130,000 Savoy had not returned. (Burke Aff. at 13.) In April 2006, the state court granted summary judgment to the IDA and ordered Savoy to return the money. (Burke Aff. at 13.)

## V. *The Prior Proceedings*

On May 24, 2006, Judge Charles L. Brieant granted summary judgment to Defendants based on res judicata and collateral estoppel arising from the April 2006 state court ruling. Plaintiffs appealed. On June 13, 2007, the Court of Appeals affirmed in part, reversed in part, and remanded (the "Summary Order"). The Court of Appeals found that Plaintiffs' defamation claim was barred by legislative immunity, but that the federal civil rights claim was not barred by res judicata, and only partially precluded by collateral estoppel. Specifically, the Court of Appeals held that because the state court found that the money transferred in July 2002 had been wrongfully disbursed, Defendants' attempt to reclaim these funds cannot form a basis for Plaintiffs' retaliation claim. (Summary Order at 3–4.) However, the Court of Appeals held that "Plaintiffs' retaliation claim is not barred ... to the extent that it is based on the defendants allegedly altering the terms of, and then rescinding the [August 26th Agreement]." (Summary Order at 4.) The Court of Appeals noted that "[t]he state court thus did not resolve whether defendants retaliated against plaintiffs by (a) making it functionally impossible to sign the long form agreement and (b) then using the failure to sign as an excuse to eventually rescind the August 26, 2002 preliminary agreement." (Summary Order at 5.)

The Court of Appeals declined to conclude that Plaintiffs would prevail on their First Amendment claim, or that the claim would survive summary judgment on grounds other than preclusion. In addition, the Court of Appeals declined to decide whether "[P]laintiffs' retaliation claim should be evaluated under the balancing test applicable to independent contractors employed by the government, *see Bd. of Cty. Comm'rs v. Umbehr*, 518 U.S. 668,

685, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), or the more stringent test applicable to general First Amendment retaliation claims, *see Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001)." (Summary Order at 5 n. 1.)

## DISCUSSION

### I. *Legal Standard*

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Davis v. Blige,* 505 F.3d 90, 97 (2d Cir.2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In determining whether there is a genuine issue as to any material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505; *Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty. of Nassau,* 524 F.3d 160, 163 (2d Cir.2008) (quoting *Guilbert v. Gardner,* 480 F.3d 140, 145 (2d Cir.2007)).

### II. *First Amendment Retaliation Claims*

#### A. *Government Contractors*

 Where a private citizen's First Amendment Rights are violated, the harm that must be proved is a "chilling effect" on the private citizen's speech. *See Curley v. Village of Suffern,* 268 F.3d 65, 73 (2d Cir.2001). Certain relationships with the government "provide[ ] a valuable financial benefit, the threat of the loss of which in retaliation for speech may chill speech on matters of public concern." *See Bd. of Cty. Comm'rs v. Umbehr,* 518 U.S. 668, 674, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996). In those relationships, a chilling effect is presumed. Thus, government employees and applicants for government employment are protected from termination, promotion, transfer, or hiring decisions based on support or association with a particular political party, unless there is some legitimate reason for requiring political affiliation. *See Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (termination based on political association); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980) (termination based on political affiliation); *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 79, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (applicants for government employment). The Supreme Court has extended the protections enjoyed by government employees against termination based on protected speech and political affiliation to the termination of contracts with independent contractors who do business with the government. *See Umbehr,* 518 U.S. at 668, 116 S.Ct. 2342 (expression); *O'Hare Truck Serv., Inc. v. City of Northlake,* 518 U.S. 712, 715, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (political affiliation and expression).

However, in *Umbehr,* the Supreme Court limited its holding to contractors with a "pre-existing commercial relationship" with the government, and expressly declined to reach the question of whether bidders or applicants for new government contracts are similarly protected. *See Umbehr,* 518 U.S. at 685, 116 S.Ct. 2342. The Court of Appeals has also declined to

reach this question, *see African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 359–60 (2d Cir.2002), and other Circuits have split, *compare Oscar Renda Contracting, Inc. v. City of Lubbock, Tex.,* 463 F.3d 378 (5th Cir.2006) (extending *Umbehr* to bidders and applicants for government contracts) and *Lucas v. Monroe Cty.,* 203 F.3d 964, 972–75 (6th Cir.2000) (same) *with McClintock v. Eichelberger,* 169 F.3d 812, 817 (3d Cir.1999) (declining to extend *Umbehr*). The one district court in this Circuit that has reached the question has extended *Umbehr* to applicants for government contracts. *See A.F.C. Enter., Inc. v. N.Y. City School Constr. Auth.,* No. 98 Civ. 4534(CJS), 2001 WL 1335010, at *14–15 (E.D.N.Y. Sept. 6, 2001).

■ In this case, there is no need to resolve the complex question of whether *Umbehr* and *O'Hare* should be extended to applicants and bidders for government contracts, because Plaintiffs have sufficiently established that there was a pre-existing commercial relationship between the parties. As Defendants admit, Plaintiffs were not mere applicants, but had a contract with the IDA that committed the IDA to loaning Plaintiffs money for their project. Thus, Plaintiffs were not simply disappointed bidders, but had been awarded their loan and signed a contract. The existence of a signed contract between the parties is enough to create a sufficient ongoing commercial relationship to bring Plaintiffs within the scope of *Umbehr* and *O'Hare*. *Cf. Ciacciarella v. Bronko,* 613 F.Supp.2d 262, 269–70 (D.Conn.2009) (finding "bright line" existed between applicants and employees irrespective of length of employment); *see also Mangieri v. DCH Healthcare Auth.,* 304 F.3d 1072, 1076 (11th Cir.2002) (finding on-going relationship where contract was not renewed despite plaintiffs prior contract); *but see McClintock,* 169 F.3d 812 (finding plaintiff who had several prior short duration, already completed contracts did not have an "ongoing commercial relationship").

B. *Legal Test*

Courts apply two principal tests to evaluate First Amendment retaliation cases brought by governmental employees. Having determined that Plaintiffs are independent contractors entitled to similar protections as government employees, the remaining question is which of these two tests should be applied—the "ad hoc balancing" approach of *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), or the "categorical" approach of the *Elrod–Branti* cases. The Supreme Court declined to decide this question in *O'Hare*. *See O'Hare,* 518 U.S. at 726, 116 S.Ct. 2353. While the *Elrod–Branti* approach is normally applied to cases involving employee terminations based on a "raw test of political affiliation," the Supreme Court has noted the *Pickering* case-by-case approach might be preferable in government contracting cases because it "will allow the courts to consider the necessity of according the government the discretion it requires in the administration and awarding of contracts over the whole range of public works and the delivery of governmental services." *O'Hare,* 518 U.S. at 719–20, 116 S.Ct. 2353. Moreover, in this case, while Plaintiffs claim that the basis for the alleged retaliation was LaMarr's Democratic affiliation, the evidence suggests that any retaliation in this case was a product both of LaMarr's Democratic affiliation and his support for specific candidates. *See O'Hare,* 518 U.S. at 719, 116 S.Ct. 2353 (noting *Pickering* would be preferred in cases where speech is "intermixed with a political affiliation requirement"). Thus, the Pickering test is the appropriate approach because of the interests involved in governmental con-

tracting and because speech in this case involves both "raw" political affiliation and expressive speech.

### C. *Plaintiffs' Claims*

■ Under *Pickering*, "to assess the extent to which a state may regulate the speech of its employees, courts must balance 'the interests of the [contractor], as a citizen, in commenting upon matters of public concern and the interest of the State, as a[ ] [contracting party], in promoting the efficiency of the public services it performs through its [contractors].'" *Morris v. Lindau*, 196 F.3d 102, 109–10 (2d Cir.1999) (quoting *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731). However, before the Court reaches this balancing test, a plaintiff bringing a First Amendment retaliation claim under § 1983 must initially demonstrate by a preponderance of the evidence that: (1) the conduct at issue is protected by the First Amendment, and (2) the plaintiff suffered an adverse decision; and (3) a causal connection exists between the speech and the adverse determination, so that it can be said that the speech was a motivating factor in the determination. *See Morris*, 196 F.3d at 110 (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–87, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). If a plaintiff establishes these three factors, the defendant has the opportunity to show by a preponderance of the evidence that it would have taken the same adverse action "even in the absence of the protected conduct." *Mt. Healthy City*, 429 U.S. 274 at 287, 97 S.Ct. 568, 50 L.Ed.2d 471.

■ Defendants do not dispute that the conduct at issue here—the right of political association or LaMarr's speech—is protected by the First Amendment. Nor can they seriously dispute that Plaintiffs suffered an adverse decision—the rejection of their loan. So, the inquiry turns to causation.

■ "The causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse [ ] action, that is to say, the adverse [ ] action would not have been taken absent the [ ] protected speech." *Morris*, 196 F.3d at 110 (citing *Mount Healthy City*, 429 U.S. at 287, 97 S.Ct. 568). "Causation can be established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment [ ], or directly by evidence of retaliatory animus." *Morris*, 196 F.3d at 110 (citing *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir.1990)). "Summary judgment is precluded where questions regarding [ ] motive predominate in the inquiry regarding how important a role the protected speech played in the adverse [ ] decision." *Morris*, 196 F.3d at 110 (citing *Piesco v. City of N.Y.*, 933 F.2d 1149, 1155 (2d Cir.1991)).

Defendants attack the causal link between the loan denial and the collapse of Plaintiffs' business. However, this completely misses the mark. To establish liability under § 1983, the only causal link that Plaintiffs need to prove is that there is a causal link between the protected speech and the adverse decision. *See Morris*, 196 F.3d at 110 ("plaintiff … must demonstrate … a causal connection between his speech and the adverse [ ] decision, so that it can be said that his speech was a motivating factor in the determination"). While the link between the loan denial and the collapse of the business may be relevant to Plaintiffs' damages, *see Miner v. City of Glens Falls*, 999 F.2d 655, 660 (2d Cir.1993), this question is not properly before the Court. Moreover, there is a question of material fact on the issue of whether the loan rejection was

motivated by protected speech. Plaintiffs have presented evidence that the November 2002 Proposal deviated materially from the August 26th Agreement and that this occurred after the Republicans regained control of the IDA Board, and that the modified terms were significantly less favorable than other loans issued by the IDA and its predecessor. Moreover, Plaintiffs also presented evidence that this decision was motivated by LaMarr's political speech and affiliation. Specifically, a jury could infer from Rockafellow's and Valentine's Position Statement, and the statements Valentine allegedly made to Cucorullo that the deviations from the August 26th Agreement were politically motivated.

Finally, under *Pickering*, the Court must consider whether the government has a sufficiently strong countervailing interest in restricting Plaintiffs' speech that outweighs Plaintiffs' interest in exercising their free speech rights. *See A.F.C. Enter.*, 2001 WL 1335010, at *17. Defendants do not argue that there is any interest served by rejecting Plaintiffs for a loan based on political affiliation or their support of particular candidates.

Accordingly, because there are significant issues of material fact that remain, Defendants' motion for summary judgment is denied.

### III. *Municipal Liability*

"[A] municipality is a 'person' amenable to suit under § 1983, although its liability could not be based upon the principle of respondeat superior." *Goldberg v. Town of Rocky Hill*, 973 F.2d 70, 72 (2d Cir.1992) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); *see also Okin v. Village of Cornwall–on–Hudson Police Dep't*, 577 F.3d 415, 438–39 (2d Cir.2009). "[A] municipality could be held liable 'when execution of [the municipality's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.' " *Goldberg*, 973 F.2d at 72 (quoting (*Monell*, 436 U.S. at 694, 98 S.Ct. 2018)). The official policy must be "the moving force of the constitutional violation." *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. Also, municipalities can be held liable under § 1983 where " 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.' " *Goldberg*, 973 F.2d at 72 (quoting (*Monell*, 436 U.S. at 690, 98 S.Ct. 2018)).

Defendants raise the question of municipal liability only in passing. It rears its head in only one paragraph of Defendants' moving brief, and is wedged in the middle of a rambling discussion of First Amendment retaliation law, the history of the IDA, and the proof required to show retaliatory motive. Despite this cameo appearance, Defendants announce in their reply brief that Plaintiffs' failure to respond to this argument indicates their concession that there is no municipal liability. However, this Court cannot fault Plaintiffs for overlooking the argument.

Based on this Court's review of the record, Plaintiffs have demonstrated that the changed terms were promulgated by the IDA and were at least in effect ratified by its Board of Directors through the rejection of the compromise proposal. *See Morris*, 196 F.3d at 111–12 (legislative act in retaliation for protected speech caused harm sufficient for municipal liability); *see also Goldberg*, 973 F.2d at 72 (municipality could be held liable where retaliatory action took place through a budget resolution). Accordingly, this is sufficient to create at least a disputed issue of material fact as to whether this action was an offi-

cial municipal policy and Defendants motion for summary judgment on the claims against the municipal defendants is denied.[3]

### CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Docket No. 75) is denied.

SO ORDERED.

---

**3.** Defendants' arguments about who made the prior loans are also off the mark. Plaintiffs do not appear to be offering those loans to establish that the IDA had an unconstitutional practice for *Monell* purposes. Those prior loans are offered to show that Defendants treated Plaintiffs materially different than other loan recipients.